[No. S005002. Dec. 15, 1988.]

SHERMAN S. WEBER, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Sherman S. Weber, in pro. per., for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Richard J. Zanassi and Dominique Snyder for Respondent.

OPINION

THE COURT.—We review the unanimous recommendation of the Review Department of the State Bar Court (hereafter the department) that petitioner Sherman S. Weber be disbarred from the practice of law in California. After considering the record and petitioner's objections, we follow the department's recommendation.

I. FACTS

We adopt the department's findings as follows:[1]

Petitioner was admitted to the practice of law in California in 1969. In 1974 petitioner drafted a will for John D. Stram (John). The will provided that John's entire estate would go to his son Ronald Stram (Ronald), and that petitioner would serve as both attorney and executor and receive fees for his services in both capacities.

John died on May 21, 1981. On December 22, 1981, petitioner filed an amended inventory and appraisement with the probate court. The docu-

---

[1] In our discussion we supplement the department's findings with details evident from the record. Petitioner does not concede the accuracy of the department's findings; indeed, he insists the true facts are quite different from those presented here. At the State Bar Court hearing, petitioner—although given every opportunity—offered no evidence to support his version of the story. Nor does he do so here.

We note several of his unsupported factual contentions in footnotes 2, 3, 4, 5, and 6, *post*.

ment listed the estate's value as approximately $200,000, including personal property, trust deeds, real property, cash, and $60,000 worth of municipal bonds. Shortly after the document was filed, petitioner and Ronald discovered additional municipal bonds—worth another $100,000—in John's safe deposit box.[2] Petitioner filed a supplemental inventory and appraisement reflecting the discovery.

Ronald questioned the propriety of petitioner receiving separate fees for work as attorney and as executor, and negotiated an oral agreement with him whereby petitioner promised to pay Ronald $4,000 out of his statutory probate fee in exchange for Ronald's performance of the executor's duties. Although Ronald performed many such duties over the following months,[3] he never received the promised $4,000 payment.[4]

On July 22, 1982, petitioner filed the final accounting of the estate with the probate court. In his petition he claimed $13,566 for attorney and executor fees, and requested the fees be satisfied by municipal bonds to the extent cash was unavailable. He also requested authority to retain $25,000 in bonds in case additional tax assessments were imposed against the estate as a result of ongoing audits he asserted had been undertaken by the Internal Revenue Service (IRS) and the Franchise Tax Board.

On August 9, 1982, the court ordered that petitioner be paid his requested fee and authorized him to retain $25,000 in bonds for a period of six months because of the ongoing audits. It further ordered that petitioner immediately distribute all other estate assets to Ronald. Petitioner subsequently distributed the trust deeds, but failed to distribute the remaining bonds and cash. He also refused to accept available cash in payment of his fee, and instead retained two municipal bonds the combined value of which was $18,312.56.

The six-month period during which petitioner was authorized to retain the $25,000 in bonds expired in February 1983. Ronald contacted petitioner

[2] Petitioner alleges that Ronald unsuccessfully attempted to conceal the existence of the additional bonds.

[3] Ronald testified at the hearing that among other things he organized John's papers, located the safe deposit box, drove petitioner to Ventura County to handle estate matters, filed probate papers, set up the fiduciary bank account, handled John's medical, utility, and insurance bills, paid the funeral expenses, settled John's credit accounts, notified the Department of Motor Vehicles and the Social Security Administration of John's death, arranged for the valuation of trust deeds and appraisals of real property, and, utilizing his skills as an accountant, prepared drafts of the estate inheritance and federal estate tax returns. Petitioner did not cross-examine Ronald; his only testimony on the point was that Ronald "never did anything."

[4] Petitioner denies any such agreement was made, and insists Ronald's demand for the $4,000 payment was "blackmail."

at that time seeking distribution of the remaining assets. Petitioner told him the distribution was being delayed because the IRS had not yet completed its audit of the estate tax return. He made similar statements to Ronald on numerous occasions during the remainder of 1983.

In December 1983 Ronald contacted the bank at which the estate account was located. He learned that instead of containing approximately $25,000 as he had believed, the account had a current balance of only $521.06. Ronald then contacted the IRS, which informed him it had at no time undertaken an audit of the estate tax return. Ronald met with petitioner shortly thereafter, but did not tell him what he had learned. At that meeting petitioner told Ronald that the bank account had a balance of approximately $25,000, and again stated that the IRS audit was ongoing.[5]

Ronald subsequently retained other counsel and informed the probate court of the difficulties he had encountered seeking a distribution of assets.[6] The court ordered petitioner to appear on January 13, 1984; when petitioner appeared on that day, the court ordered him to distribute all remaining assets by January 18, 1984. Petitioner filed a "Supplemental Accounting by Executor and Final Distribution" on January 18, 1984, stating, among other things, that he held $24,789.11 in cash as well as $125,000 worth of bonds for the estate. He refused to actually distribute the assets, however, unless Ronald signed a document releasing him from all liability for his handling of the estate. Ronald refused to sign such a release.

On January 30, 1984, the Ventura Superior Court issued an order to show cause re contempt for petitioner's failure to obey the August 9, 1982, distribution order. At a hearing on the matter on February 10, 1984, the court ordered petitioner to comply with the distribution order. When petitioner insisted he would not comply unless he first obtained a written release from liability, the court found him in contempt and ordered him jailed. After spending five hours in jail, petitioner agreed to turn over all the estate's assets by 5 p.m. on Monday, February 13, 1984.

On February 13, 1984, petitioner gave Ronald the remaining bonds and presented him with a check—dated February 14, 1984, and drawn against the estate checking account—for $24,789.11. Ronald's counsel telephoned

[5] Petitioner asserts that "somebody" at the IRS told him an audit was in progress. Although the IRS sent petitioner a letter dated January 31, 1983—which was never returned—in which it informed him the estate tax return had been accepted as filed, petitioner claims he did not receive the letter until January 13, 1984.

[6] Petitioner asserts this was the beginning of a conspiracy against him which ultimately spread to include Ronald, his attorney, his attorney's entire law firm, every judge on the Ventura Superior Court, and the Sheriffs of Los Angeles and Ventura Counties.

the bank, which informed him the account contained insufficient funds to cover payment of the check. The funds remained insufficient the following day; the court, when so informed, issued a bench warrant for petitioner's arrest.[7] It recalled the warrant, however, when the check finally cleared on February 16. On the following day the court suspended petitioner as executor of the estate.

On May 7, 1984, the court held a hearing on petitioner's "Petition for Extraordinary Fees and Costs," which he had filed prior to the contempt hearing. Petitioner did not attend, but instead sent an attorney who requested a continuance on petitioner's behalf and then departed after the court denied the request. The hearing proceeded, and the court (1) denied petitioner's earlier filed motions, (2) permanently removed him as executor of the estate, and (3) ordered him to pay $81,504.34 to Ronald. That figure represented, among other items, $15,000 in punitive damages, $8,746.56 for bonds taken by petitioner in excess of his fee, $9,000 for a bond the court determined was missing from the estate, and $21,310.67 as double the value of property petitioner had concealed or embezzled. The judgment was entered on May 24, 1984.

On petitioner's appeal, the Court of Appeal affirmed the judgment and we denied review. Petitioner also filed a federal action against Ronald, Ronald's attorneys, the entire Ventura Superior Court, and the Court of Appeal, alleging a conspiracy to violate his civil and constitutional rights. The district court dismissed the action, and the dismissal was affirmed on appeal. (*Weber* v. *Nordman, Cormany, Hair & Compton* (9th Cir. 1987) 829 F.2d 41.)

## II. STATE BAR PROCEEDINGS

On October 6, 1986, a notice to show cause was filed with the State Bar Court. The notice—which had been served on petitioner a few days earlier—informed him that a formal disciplinary hearing would be held to consider disciplinary charges against him, and advised him of the particular transgressions of which he was accused. A mandatory settlement conference was scheduled for February 2, 1987. Petitioner, although notified more than 90 days in advance, did not attend the settlement conference; a formal hearing was then scheduled for March 24, 1987.

At the formal hearing, petitioner requested a continuance on the ground that he needed time to obtain counsel. He also moved to disqualify the

---

[7] Bank records reveal that $24,270 was deposited in the account on February 14, 1984; however, $10,000 was withdrawn the same day, leaving a balance of only $14,791.06 on that date. The source of the funds is unknown.

referee on the basis of a "peremptory challenge," and to disqualify the hearing examiner on the ground that she had behaved abusively toward him. The referee denied all three motions; the supervising referee, after reviewing the rulings at petitioner's request, did the same. The hearing then proceeded and was concluded the same day.

On March 30, 1987, petitioner filed another action—this time in Los Angeles Superior Court—against Ronald and his attorneys. In that action, in addition to reasserting his conspiracy theory, petitioner sought to have the judgment against him of May 24, 1984, set aside on the ground that it had been obtained through perjury. On April 17, 1987, the State Bar Court granted the State Bar's application to present additional evidence in the State Bar Court proceedings. That document brought to the court's attention petitioner's perjury allegations—which, as will appear, the record demonstrates were patently false. On April 30, 1987, petitioner filed an amended complaint asserting supplemental causes of action and naming the entire Ventura Superior Court and Ventura County as additional defendants.

On April 1, 1987, petitioner filed still another action in Los Angeles Superior Court—this time against the State Bar, its officials, the hearing examiner, and the referee—accusing them of conspiring to deny his civil and constitutional rights, and accusing the referee and hearing examiner of improper conduct.

On May 14, 1987, the hearing panel unanimously recommended that petitioner be disbarred. Petitioner twice sought and was denied a hearing de novo. On December 10, 1987, the department also unanimously recommended that petitioner be disbarred.

The department concluded that petitioner (1) violated the court order of August 9, 1982, by keeping funds and documents beyond the six-month deadline set by the court; (2) knowingly made false representations to the court and to Ronald regarding the initiation of tax audits; (3) willfully made a false representation to the court when, on February 10, 1984, he stated that the cash balance of the estate trust account was $24,789.11 instead of the true figure of $521.06; (4) refused to obey a lawful order of the court when, on February 10, 1984, he refused to distribute the estate assets without receiving a release from liability; (5) knowingly wrote a check, in response to the court's order, on an account that held insufficient funds to cover payment; (6) willfully commingled, diverted, and misappropriated more than $24,000 from the estate; (7) willfully violated Rules of Professional Conduct, rule 2-107 by failing to pay Ronald $4,000 from his statuto-

ry fee for Ronald's work on the estate as agreed;[8] (8) willfully violated Rules of Professional Conduct, rule 6-102 by demanding an unconditional release from liability before distributing the assets;[9] (9) willfully violated Rules of Professional Conduct, rule 7-105 by making false representations to several courts regarding both the initiation of tax audits and the extent of estate assets in his possession;[10] (10) willfully violated Rules of Professional Conduct, rule 8-101 by failing to keep estate assets separate and apart from his own personal assets, and by using those assets for his own benefit;[11] (11) violated Rules of Professional Conduct, rule 6-101 and Business and Professions Code sections 6067, 6068, and 6103 by virtue of the actions listed above;[12] and (12) committed acts—as specified above—involving moral tur-

---

[8] Rule 2-107(A) provides: "A member of the State Bar shall not enter into an agreement for, charge or collect an illegal or unconscionable fee."

[9] Rule 6-102 provides, in pertinent part: "A member of the State Bar shall not attempt to exonerate himself from or limit his liability to his client for his personal malpractice."

[10] Rule 7-105 provides, in pertinent part: "In presenting a matter to a tribunal, a member of the State Bar shall: (1) Employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and shall not seek to mislead the judge, judicial officer or jury by an artifice or false statement of fact or law."

[11] Rule 8-101 provides, in pertinent part: "(A) All funds received or held for the benefit of clients by a member of the State Bar . . . shall be deposited in one or more identifiable bank accounts . . . and no funds belonging to the member of the State Bar . . . shall be . . . commingled therewith . . . ."

[12] Rule 6-101(A)(2) provides: "A member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently."

Business and Professions Code section 6067 provides, in pertinent part: "Every person on his admission shall take an oath to support the Constitution of the United States and Constitution of the State of California, and faithfully to discharge the duties of any attorney at law to the best of his knowledge and ability."

Business and Professions Code section 6068 provides, in pertinent part: "It is the duty of an attorney to do all of the following:

"· · · · · · · · · · · ·

"(b) To maintain the respect due to the courts of justice and judicial officers.

"· · · · · · · · · · · ·

"(d) To employ, for the purpose of maintaining the causes confided to him or her such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.

"· · · · · · · · · · · ·

"(f) To abstain from all offensive personality, and to advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he or she is charged.

"· · · · · · · · · · · ·

"(i) To cooperate and participate in any disciplinary investigation or other regulatory or disciplinary proceeding pending against the attorney. . . .

"· · · · · · · · · · · ·

"(m) To respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services."

Business and Professions Code section 6103 provides: "A wilful disobedience or violation of an order of the court requiring him to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, and any violation of the oath

pitude and dishonesty, and evidencing his corruption, in violation of Business and Professions Code section 6106.[13]

By way of mitigation the department found only that petitioner had no prior disciplinary record; it further found that none of petitioner's evidence mitigated the department's conclusions. In aggravation, it found that petitioner had (1) demonstrated contempt for the State Bar and its procedures, personnel, and proceedings, (2) filed a frivolous suit against the State Bar, its president, various employees of the State Bar Court, and the referees who handled his case, and (3) filed frivolous suits against Ronald, his attorneys, the probate judges, and the Court of Appeal.

### III. DISCUSSION

■ While we give great weight both to the department's disciplinary recommendation (*In re Severo* (1986) 41 Cal.3d 493, 500 [224 Cal.Rptr. 106, 714 P.2d 1244]) and the hearing panel's factual findings (*In re Kreamer* (1975) 14 Cal.3d 524, 532, fn. 5 [121 Cal.Rptr. 600, 535 P.2d 728]), we exercise our independent judgment in determining the appropriate discipline to be imposed (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754]; *In re Chira* (1986) 42 Cal.3d 904, 909 [231 Cal.Rptr. 560, 727 P.2d 753]). Petitioner, however, bears the burden of showing the department's recommendation is erroneous or unlawful (Bus. & Prof. Code, § 6083, subd. (c); *Trousil* v. *State Bar* (1985) 38 Cal.3d 337, 341 [211 Cal.Rptr. 525, 695 P.2d 1066]), or that its findings are not supported by the record (*Smith* v. *State Bar* (1985) 38 Cal.3d 525, 538-539 [213 Cal.Rptr. 236, 698 P.2d 139]).

### A. *Denial of a Continuance*

■ Petitioner first contends the State Bar Court erred in refusing to grant his request for a continuance. As a result of that error, he asserts, he "was compelled to represent himself without the representation of counsel, without the assistance of his witnesses and their records, and without his own books and records, and was compelled to testify from his own recollection," in violation of his rights under Business and Professions Code section 6085 and of his due process rights and rights to counsel under the state and federal Constitutions.

---

taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension."

[13] Section 6106 provides, in pertinent part: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension."

The contention is without merit. Business and Professions Code section 6085 provides that a party complained against "shall be given *reasonable notice* and have a *reasonable opportunity*" (italics added) to present evidence, be represented by counsel, and examine and cross-examine witnesses. As will appear, the record clearly establishes that petitioner received such notice and had such opportunity.

The State Bar's notice to show cause was served on petitioner by certified mail on October 1, 1986—more than five months prior to his hearing. On October 7, 1986, the State Bar's acting chief trial counsel, in reply to a letter from petitioner regarding his case, suggested that he "consider employing counsel to assist [him] in this most serious matter." On October 10, 1986, petitioner wrote back and explicitly rejected the acting chief trial counsel's suggestion.[14]

At the State Bar Court hearing petitioner admitted he made no effort to obtain counsel prior to February 2, 1987, because he thought the bar would remove the hearing examiner as he had requested. He did not then, nor does he now, explain how the substitution of one hearing examiner for another would have rendered counsel unnecessary; but in any event, the record discloses that the acting chief trial counsel, in his October 7, 1986, letter mentioned above, specifically informed petitioner that the bar would not grant his request to remove the hearing examiner.

Thus the record demonstrates that for more than five months petitioner was on notice that disciplinary proceedings were pending against him. It also reveals that although petitioner had been advised from the outset to retain counsel, he chose not to do so. Nor was he prevented in any way from presenting witnesses, records, and other evidence at the hearing. In short, petitioner had more than ample time in which to secure counsel and prepare his case, but failed to do so. Neither statutory nor constitutional considerations required the State Bar Court referee to grant a continuance under those circumstances.

Indeed, petitioner has made numerous requests for continuances throughout these proceedings before the State Bar and in this court. The relentlessly repetitious nature of his requests—some in the form of demands—suggests a scheme to delay. Thus on March 24, 1987, he sought a continuance before the hearing panel. On August 19, 1987, he sought a continuance before the review department. On August 31, 1987, he sought another continuance before the review department; this was granted, and

---

[14] Petitioner wrote "My matter is clearly beyond your 'comprehension, competency and capability.' It will not be solved, as you ridiculously suggest, by 'employing counsel to assist me in this serious matter.'"

the matter was continued to November 1987. His petition for review was originally scheduled to be heard by this court at its September 1988 calendar. Petitioner requested a continuance because of his wife's illness; this was granted, and the matter was continued to the court's October 1988 calendar. On September 26, 1988, petitioner advised the court that his wife had passed away and he would be in a state of mourning for 30 days, and requested another continuance. This too was granted, and the matter was again continued—for more than 30 days—to the court's calendar in Sacramento on November 2, 1988; petitioner was told that he was expected to appear at that time either in person or by counsel.

Unsatisfied, petitioner asked for still another continuance, until January 1989; this was denied. He then repeated the same request, asserting that he was physically and mentally unable to appear in Sacramento. His letter to this court was in the nature of a threat: "Do Not Torture Me Again, or I shall create a public uproar." The repeated request was denied. Petitioner did not appear in this court on November 2, 1988, and the matter was submitted on the record and the briefs of petitioner and respondent without oral argument.

## B. *Refusal to Disqualify the Hearing Examiner and Referee*

■ Petitioner next contends the State Bar Court erred in refusing to grant his requests to disqualify the hearing examiner and referee. He asserts that rule 230 of the Rules of Procedure of the State Bar of California (rule 230) gave him the right to "disqualify any referee or examiner for cause or otherwise."

The contention is without merit. First, rule 230 contemplates only the disqualification of referees; thus it could not provide the basis for a right to disqualify a hearing examiner. Second, the rule does not, as petitioner contends, provide for disqualification of a referee without cause. Third, none of the bases for disqualification set forth in rule 230 apply here.

Rule 230 provides that a referee shall be disqualified if one or more of the following conditions exists: (1) the referee would have been disqualified as a judge under certain subdivisions of Code of Civil Procedure section 170.1; (2) the referee or his firm has a conflict of interest because of other current or pending litigation; or (3) a verified showing of facts supports the inference that the referee is biased against the attorney, his counsel, or the hearing examiner. Petitioner fails to demonstrate the existence of any of these conditions.

The subdivisions of Code of Civil Procedure section 170.1 referred to by rule 230 provide that a judge shall be disqualified if he "has personal knowl-

edge of disputed evidentiary facts concerning the proceeding" (subd. (a)(1)), "served as a lawyer in the proceeding" or in any proceeding involving the same issues or clients (subd. (a)(2)), "has a financial interest in the subject matter" of the proceeding (subd. (a)(3)), "is a party to the proceeding" (subd. (a)(4)), "is associated in the private practice of law with a lawyer in the proceeding" (subd. (a)(5)), or "is unable to properly perceive the evidence or . . . properly conduct the proceeding" (subd. (a)(7)). Petitioner does not allege, and the record does not reveal, that any of these conditions apply here. Nor does petitioner allege any conflict of interest on the part of the referee.

Petitioner does allege the referee was biased against him. However, he offers nothing approaching the "verified showing of facts" required to support an inference of bias under rule 230. Instead, he asserts only that he "demanded the disqualification of [the] referee . . . by reason of prejudicial remarks which he had made prior to the hearing, to [Ronald] and his counsel, which the petitioner overheard and found . . . to be grounds for the disqualification." Even this bald assertion, however, is demonstrably false. At the hearing, the following exchange took place: "Referee: Sir, what are your grounds for the motion to disqualify me? [¶] Petitioner: Well, I understand that I have a right to disqualify any referee I don't like for any cause. [¶] Referee: You're making a peremptory challenge without any grounds for cause? [¶] Petitioner: Yes."

Petitioner has demonstrated no grounds on which either the referee or the hearing examiner should have been disqualified; accordingly, the State Bar Court did not err in refusing to disqualify them.

### C. *Refusal to Grant a Hearing De Novo*

Petitioner next contends he was entitled to a hearing de novo under rule 562 of the Rules of Procedure of the State Bar of California (rule 562), and that the hearing panel violated both his civil rights and his constitutional rights to due process and representation by counsel when it denied his request for such a hearing.

The contention is without merit. Rule 562 does not entitle parties in State Bar proceedings to a hearing de novo on demand—it provides that parties may *apply* for such a hearing, stating the legal grounds for the request. The hearing panel may then either grant or deny the application.

Petitioner argues that the hearing panel should have granted his request because he "was compelled to appear [at the State Bar hearing] without being represented by counsel, without witnesses and without his books and

records." We have already rejected the identical argument in connection with the referee's denial of petitioner's request for a continuance. It is no more persuasive in the present context.

Additionally, petitioner makes the grave error of falsely stating to this court that Ronald testified to having committed perjury. Petitioner asserts here that Ronald, at the State Bar Court hearing, "admitted under oath, that he had perjured himself on May 7, 1984 in the Superior Court of Ventura, in a proceeding . . . in which [he] falsely swore that the 'petitioner stole municipal bonds of the face value of $15,000,' whereas in fact 'no such bonds existed.' " Petitioner further asserts that Ronald testified "that such perjury was suborned by his counsel."

Our careful reading of the entire record of the State Bar Court hearing uncovers nothing remotely resembling the testimony petitioner attributes to Ronald, and reveals nothing that might justify the very serious charges petitioner makes against him.[15] Making false statements to this court—which in itself violates both Rules of Professional Conduct, rule 7-105 and Business and Professions Code section 6068—does little to enhance the persuasiveness of petitioner's arguments. (See *Bach* v. *State Bar* (1987) 43 Cal.3d 848, 855 [239 Cal.Rptr. 302, 740 P.2d 414]; *Davis* v. *State Bar* (1983) 33 Cal.3d 231, 239-240 [188 Cal.Rptr. 441, 655 P.2d 1276].)

### D. *Petitioner's Frivolous Lawsuits as Aggravating Factors*

██ Petitioner next contends the referee erred in citing as aggravating factors certain lawsuits petitioner filed in connection with this case. He asserts he is entitled to bring actions against those who deprive him of his civil rights, and that the referee's citation of the suits as aggravating factors represents "a malicious, wilful and corrupt usurpation of power by a corrupt referee who intends to cover up his own misconduct and misdeeds [at the State Bar Court hearing] by shifting the blame to the petitioner [and] by making him the 'scapegoat' for the misfunctions and malfunctions of the State Bar." The contention is without merit.

The referee made two statements in reference to petitioner's lawsuits. We consider them individually.

First, after noting that petitioner had filed actions against every judge on the Ventura Superior Court and every attorney who opposed him in the probate of John's estate, the referee stated: "This is viewed as aggravation

---

[15] Indeed, perjury was never discussed; at the pages in the record petitioner cites in support of his accusation, Ronald stated only that he could not identify a specific missing bond on the basis of a partial list of bonds he had made five years earlier.

and certainly no indication of remorse nor any explanation as to the cause for the conduct of [petitioner]."

■ Absence of remorse is properly considered as an aggravating factor in deciding the appropriate discipline for an attorney. (*Garlow* v. *State Bar* (1988) 44 Cal.3d 689, 711 [244 Cal.Rptr. 452, 749 P.2d 1307]; *Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 197 [242 Cal.Rptr. 196, 745 P.2d 917]; cf. *In re Nadrich* (1988) 44 Cal.3d 271, 278 [243 Cal.Rptr. 218, 747 P.2d 1146].) The same is true of an attorney's failure to acknowledge the wrongfulness of his acts. (*Marquette* v. *State Bar* (1988) 44 Cal.3d 253, 266 [242 Cal.Rptr. 886, 746 P.2d 1289]; cf. *In re Nadrich, supra,* 44 Cal.3d at p. 278.) ■ Accordingly, the referee—having concluded that petitioner committed numerous wrongful acts in his handling of John's estate before the Ventura court—could properly consider evidence that might indicate whether petitioner demonstrated remorse and accepted responsibility for those actions.

In petitioner's state lawsuit against the Ventura judges and attorneys—which he filed shortly after his State Bar hearing—he vehemently denied any wrongdoing and insisted he was the innocent victim of an ongoing conspiracy among the judges, attorney, Ronald, and others.[16] Thus the lawsuits were obviously highly probative on the question of petitioner's acceptance of responsibility for his actions, and the referee did not abuse his discretion in considering them for that limited purpose.

Second, after taking judicial notice of petitioner's action against the State Bar and its officials, and against the hearing examiner and referee, the referee stated "It is felt that this is in itself contempt and disrespect for the

---

[16] As mentioned above, three years earlier petitioner filed a similar lawsuit in federal court against, among others, every judge of the Ventura Superior Court, every attorney who opposed him in that court, the Sheriffs of Ventura and Los Angeles Counties, and Ronald. Petitioner sought injunctive relief as well as $150 million in compensatory damages and $450 million in punitive damages. Characterizing the above-named defendants as "a group of greedy, vicious and unscrupulous operators, corruptly intent to reap hefty profits and fees from their evil deeds," petitioner alleged the defendants "entered into an unlawful, wilful and corrupt conspiracy, and pursuant to said conspiracy . . . proceeded . . . to wilfully, maliciously and corruptly violate [petitioner's] constitutional and civil rights." The district court dismissed the action, and the dismissal was affirmed on appeal. (*Weber* v. *Nordman, Cormany, Hair & Compton, supra,* 829 F.2d 41.)

In his state action filed shortly after the State Bar Court hearing of March 24, 1987, petitioner named most of the same defendants and sought injunctive relief as well as $600 million in compensatory damages and $1.8 billion in punitive damages. He again alleged his conspiracy theory, but this time added actions for fraud and defamation. He based an additional cause of action on the same false representations he makes here regarding Ronald's purported "admissions" of perjury. The case was transferred to the Ventura Superior Court, which declared petitioner a vexatious litigant (Code Civ. Proc., § 391) and dismissed the suit (*id.,* § 391.4). Petitioner did not appeal.

State Bar and its proceedings as well as its personal and volunteer referees. It is the finding of this referee that this is an attempt to thwart the discipline of the State Bar and to prevent the State Bar from acting and from the [*sic*] attorney being disciplined."

■ It is well settled that an attorney's contemptuous attitude toward the disciplinary proceedings is relevant to the determination of an appropriate sanction. (*Marquette* v. *State Bar, supra,* 44 Cal.3d at p. 266; *Maltaman* v. *State Bar* (1987) 43 Cal.3d 924, 958 [239 Cal.Rptr. 687, 741 P.2d 185]; cf. *Segretti* v. *State Bar* (1976) 15 Cal.3d 878, 888 [126 Cal.Rptr. 793, 544 P.2d 929].) ■ Accordingly, the referee could properly consider actions by petitioner tending to demonstrate such an attitude.

In petitioner's lawsuit against the State Bar and its representatives—also filed less than one week after his State Bar hearing—he alleged a conspiracy among the various defendants to deny him his rights, accused the referee and hearing examiner of improper conduct, and characterized the disciplinary process as "kangaroo court proceedings."[17] Thus the patently frivolous lawsuits were highly probative of petitioner's attitude toward the disciplinary proceedings, and the referee did not abuse his discretion in considering them for that limited purpose.[18]

---

[17] Petitioner sought injunctive relief as well as $100 million in compensatory damages and $300 million in punitive damages on the theory that the State Bar and its agents "acted in concert, and in an unlawful conspiracy to deprive [petitioner] of his civil and constitutional rights of due process, right to counsel, right to have his day in court, and the right to property and to the practice of his profession." The trial court sustained the defendants' demurrer without leave to amend and entered a judgment of dismissal. The Court of Appeal affirmed that judgment in an unpublished opinion, and we denied petitioner's request for review.

[18] The record is replete, moreover, with expressions of petitioner's contempt for the State Bar and its disciplinary proceedings. In letters to the chief trial counsel of the State Bar, petitioner referred to the hearing examiner as a "misfit and a lunatic" and stated his unwillingness to participate in the proceedings unless she was removed. When that request was denied, he denounced the decision as a "travesty" and wrote "Unfortunately for you, . . . I am the wrong guy for your corrupt troops." He closed by informing the chief trial counsel, "I shall pray to the Lord to smite you and destroy you from the face of the earth . . . ."

At the State Bar Court hearing, petitioner accused the examiner of having a "relationship" with Ronald, left the room several times while proceedings were in progress, repeatedly interrupted the referee, and made combative remarks toward both the referee and the hearing examiner.

Finally, in his briefs to this court petitioner again refers to the examiner as a "misfit and a lunatic" who he claims engaged in a "colossal vilification and defamation" of him at the hearing. He states that the referee was a "corrupt" individual who acted "willfully, maliciously, and viciously" against him, and who spent "most of the hearing transacting his own business over the telephone, paying little attention to what was going on." He contends the review board had a "sleazy attitude" and "failed to grasp the basics of this matter," and asserts that the board's members "do not understand or comprehend" the meaning of "moral turpitude." He labels the State Bar's arguments here "madness and lunacy" and certain of its accusations "ridiculous and offensive."

## IV. Appropriate Discipline

■ Our independent review of the record plainly confirms the department's findings. The record clearly establishes that petitioner (1) misappropriated substantial funds entrusted to him in the course of his professional duties, a grievous offense " 'warrant[ing] disbarment in the absence of extenuating circumstances' " (*Marquette* v. *State Bar, supra,* 44 Cal.3d at p. 266, quoting *Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 15 [206 Cal.Rptr. 373, 686 P.2d 1177]; Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct, std. 2.2(a); State Bar Rules Prof. Conduct, rule 8-101); (2) knowingly made false representations to the court regarding first the initiation of an IRS audit and later the cash balance of the estate trust account, in "basic violation of an attorney's role, oath, and duties" (*Maltaman* v. *State Bar, supra,* 43 Cal.3d at p. 957; Bus. & Prof. Code, § 6068, subds. (a), (b) & (d); State Bar Rules Prof. Conduct, rule 7-105); (3) twice failed to comply with lawful court orders to distribute portions of John's estate, evidencing "moral turpitude and disrespect for the legal system bearing on his fitness to practice" (*Maltaman* v. *State Bar, supra,* 43 Cal.3d at p. 958; Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct, std. 2.3; Bus. & Prof. Code, §§ 6068, subds. (a), (b), 6103, 6106); and (4) knowingly wrote a check, in response to a court order, on an account that held funds insufficient to cover payment (State Bar Rules Prof. Conduct, rule 6-101).

The only mitigating circumstance presented is the fact that petitioner has no prior disciplinary record since his admission to the bar on June 27, 1969. In aggravation, petitioner exhibits a complete failure to appreciate the gravity of his conduct (*Maltaman* v. *State Bar, supra,* 43 Cal.3d at p. 958), expresses no remorse (*Garlow* v. *State Bar, supra,* 44 Cal.3d at p. 711; *Kapelus* v. *State Bar, supra,* 44 Cal.3d at p. 197), denies all responsibility for any wrongdoing, and demonstrates continuing contempt for the disciplinary proceedings (*Marquette* v. *State Bar, supra,* 44 Cal.3d at p. 266; *Maltaman* v. *State Bar, supra,* 43 Cal.3d at p. 958).

In sum, petitioner's acts of wrongdoing are numerous and serious; they mandate disbarment—despite the lack of previous disciplinary proceedings—(see *Bambic* v. *State Bar* (1985) 40 Cal.3d 314, 324-325 [219 Cal.Rptr. 489, 707 P.2d 862])—unless "the most compelling mitigating circumstances clearly predominate" (Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct, std. 2.2(a).) We find no such compelling circumstances here; further, "[w]e have no reason to believe that petitioner, if allowed to continue in the practice of law, would amend his ways." (*Marquette* v. *State Bar, supra,* 44 Cal.3d at p. 267.)

Accordingly, we conclude it is in the best interest of the public, the profession, and the courts that petitioner be disbarred.

It is ordered that Sherman S. Weber be disbarred from the practice of law, that his name be stricken from the roll of attorneys, that he comply with the requirements of Rule 955 of the California Rules of Court, and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective on the finality of this opinion.