[No. S010566. May 7, 1990.]

HERBERT F. LAYTON, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Herbert F. Layton, in pro. per., for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Richard J. Zanassi and Mara Mamet for Respondent.

OPINION

THE COURT.—We review today the recommendation of the Review Department of the State Bar Court of the State of California (review department) that Herbert F. Layton (Layton) be suspended from the practice of law for three years, that execution of the order for such suspension be

stayed, and that Layton be placed on probation for five years upon conditions including actual suspension from practice for thirty days. We agree with the review department that Layton wilfully failed to use reasonable diligence to accomplish the purposes for which he was employed (Rules Prof. Conduct, former rule 6-101(2)), recklessly and repeatedly failed to perform legal services competently (Rules Prof. Conduct, former rule 6-101(A)(2)),[1] and through his misconduct violated his duties as an attorney (Bus. & Prof. Code, § 6103). Consequently, we adopt the recommendation that Layton be suspended from practice for three years, that such suspension be stayed, and that he be placed on probation with conditions including thirty days' actual suspension. However, because Layton has practiced law for over 30 years without prior disciplinary incident, we conclude that 3 years' probation will sufficiently protect the public, the courts, and the legal profession. (*Sands* v. *State Bar* (1989) 49 Cal.3d 919, 928 [264 Cal.Rptr. 354, 782 P.2d 595].)

FACTS

The findings of fact made by the Hearing Department of the State Bar Court of the State of California (hearing department), which were almost wholly adopted by the review department, demonstrate that:

Layton was admitted to the practice of law in California in 1959, and has been a member of the State Bar since that date.

In 1976, Vera Spencer retained Layton to draft her will (the Will), which he did. The Will, executed on August 26, 1976, provided, inter alia, that all tangible personal property was to go to Mrs. Spencer's daughter, Betty Johnson (Johnson), and that the residue, including Mrs. Spencer's Oakland, California residence (the House), was to go to Layton as trustee.

The trust's terms provided, inter alia, that $5,000 per year was to be paid to Johnson on her demand, plus such additional amounts as Layton should

---

[1] The conduct at issue in this case took place in the years 1979 through 1984. At different times during this period, two versions of the Rules of Professional Conduct governing an attorney's failure to diligently perform legal services were in force. In 1979, former rule 6-101 of the Rules of Professional Conduct of the State Bar of California (rule 6-101) provided, in pertinent part, that "A member of the State Bar shall not wilfully or habitually . . . [f]ail to use reasonable diligence and his best judgment in the exercise of his skill and in the application of his learning to accomplish, with reasonable speed, the purpose for which he is employed." Amendments effective on October 21, 1983, revised rule 6-101 to provide, in pertinent part, that "[a]ttorney competence means the application of sufficient learning, skill and diligence necessary to discharge the member's duties arising from the employment or representation . . . . A member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently."

deem appropriate to the needs of Johnson and her children; that $300 was to be paid to Mrs. Spencer's niece, Esther Blank, in December of each of the two years following Mrs. Spencer's death; and that after Johnson's death, and upon Mrs. Spencer's youngest grandchild's reaching age twenty-five, the trust was to be distributed at the rate of $10,000 every five years to each of Mrs. Spencer's four grandchildren. Layton, as trustee, was given certain investment and management powers, and was also designated executor.

Mrs. Spencer died on March 9, 1979. Layton filed the Will for probate in the Alameda County Superior Court on March 23, 1979. On April 23, 1979, the Will was admitted and letters testamentary were issued to Layton as executor.

The value of Mrs. Spencer's estate (Estate), including the House, was in excess of $240,000, of which about $100,000 was cash or cash equivalents.

While executor, Layton adequately acted to conserve and increase the cash assets in the Estate by investing and reinvesting them in high-yield certificates of deposit.

Shortly after her mother's death, Johnson informed Layton that she knew of potential tenants for the House, and discussed with him the desirability of renting it. Layton, without investigation, advised against renting the House because he thought that necessary repairs and other expenses might exceed rents. (Layton knew that the roof of the House was leaking and that the furnace was in need of repair.) Layton also was concerned that there might be problems with rent control regulations. At no time while executor of the Will and trustee of the trust established thereunder did Layton obtain an appraisal of the House to determine its value for either sale or rental, nor did he make any effort to sell or rent it.

In the period immediately following Mrs. Spencer's death, Johnson visited the House often, collecting any mail that had arrived. Periodically, she delivered this mail to Layton's office in the Central Bank Building in Oakland. In early 1983, Layton left that office and began operating from an apartment in Albany, California. At this time, Johnson ceased delivering the decedent's mail to Layton. Instead she marked it, "Return to sender; refer to Mr. Herbert Layton, Executor of the Estate of Vera C. Spencer." This mail frequently took a considerable time to reach Layton at his Albany address. Layton, however, failed to notify persons dealing with the Estate that mail should be sent to him; nor did he file a change of address with the

postal service. During this period, Layton became very difficult to contact, and seldom returned Johnson's telephone calls.

Layton failed to arrange for payment of utility bills on the House in the few months after Mrs. Spencer's death, though he received the bills in the mail that Johnson delivered to him. Power to the House was disconnected for nonpayment of bills.

Several months after Mrs. Spencer died, Johnson's son, Stuart Finta, with Layton's and Johnson's approval, moved into the House. He paid no rent. He had the utilities reconnected and paid for them. He unsuccessfully attempted roof repairs. Stuart Finta stayed in the House until fall, 1981. In January 1982, Johnson's other son, Richard Finta, replaced his brother as tenant in the House on similar conditions. Richard Finta stayed in the House at least until 1984.

From Mrs. Spencer's death in 1979 until 1984, Layton failed to have the roof repaired, even after Johnson, in 1983, furnished him with a repair estimate. (Layton did obtain another estimate.) He failed to take steps to repair the furnace, which deteriorated until it became inoperable.

Layton failed to maintain the insurance on the House. In June 1979, the insurance was cancelled for nonpayment of premiums. Layton received a notice of cancellation, but took no action until February 1984, after Johnson filed a petition to remove him as personal representative of the Estate. Only at that time did Layton obtain insurance coverage for the House.

Layton apparently experienced difficulties in locating certain items of relatively insignificant value in the Estate and in establishing title to certain bank accounts and bonds valued at approximately $300. He also had difficulty establishing the value of certain items of personal property, including a large music box ultimately valued at $1,000. As a result of these difficulties, Layton did not obtain the inventory and appraisement from the inheritance tax referee until April 1980. He failed to file this inventory and appraisement until February 16, 1984. Layton testified that his secretary may have misinterpreted his instruction to "file" the inventory and appraisement to mean it should be filed in Layton's office files, rather than with the court.

Layton failed to file an accounting of the Estate until February 16, 1984. He explained this failure by saying he had been unable to bring the account-

ing into balance, because the asset side of the account persistently showed an excess of $5,200. Johnson and her husband offered to obtain expert assistance with the problem, but Layton refused. It took Layton four years to discover that the $5,200 was an interest installment on a certificate of deposit in Chartered Bank that had been deposited directly into the Estate's account with that bank.

On April 9, 1980, Layton deposited $12,500 with the state taxing authorities against inheritance tax liabilities. However, he failed to prepare a Form IT-22 (state inheritance tax declaration) for the Estate until November 1981, failed to file the report of the inheritance tax referee until January 24, 1983, and failed to obtain an order fixing the tax until February 10, 1983.

Layton failed to file a federal tax return on behalf of the Estate until April 1980, although required by the Internal Revenue Service to do so within nine months after Mrs. Spencer's death. Layton claimed the delay was attributable to his having to wait for the inventory and appraisement to be completed by the inheritance tax referee. The record does not support this explanation for Layton's untimely filing of the tax return. Layton filed the tax return without the inventory and appraisement. Indeed, Layton did not even *receive* the inventory and appraisement until after he had filed the tax return. As a result of the late filing, penalties and interest of approximately $4,000 were assessed against the Estate. Layton made no payment on the amounts sought by the Internal Revenue Service. The assessment was collected by levy on the Estate's bank account in December 1982.

At the time of her death, Mrs. Spencer had a brokerage account (Account) with E.F. Hutton & Co. (Hutton). At all times while Layton was responsible for handling matters related to the Account, the Account remained in Mrs. Spencer's name, and Hutton continued to send mail regarding it to the House. Layton claimed that he asked Hutton to change the address for the Account to that of his office, but that they refused. (The hearing department referee could think of no reason to credit this claim.) Hutton deposited dividends and other payments due the Account in a non-interest-bearing checking account and, periodically, drew checks payable to Mrs. Spencer. Hutton mailed these checks to the House. Layton, straining the credulity of the hearing department referee, claimed that these checks often took so long to reach him that they became stale. In any event, funds remained for considerable periods of time in Hutton's non-interest-bearing account, accumulating therein, on at least one occasion, to more than $2,400.

From the date of Mrs. Spencer's death until 1984, Layton took no steps to obtain distribution or partial distribution of the Estate, despite Johnson's expressed need and desire to receive funds from the trust. (Layton claims that the superior court would permit no distribution until a perfectly balanced accounting had been filed.) In September 1980, Johnson's husband had a triple-bypass operation and Johnson desperately needed money. She asked Layton to move the Estate forward so that she could draw money from the trust. Rather than so doing, Layton, without court authority, paid her, on September 30, 1980, $3,000 from Estate funds.

In November 1983, Johnson retained Michael W. Perna, Esq. (Perna), to assist her in seeing that the Estate was closed and the trust established. Perna filed on Johnson's behalf a "Petition for Removal of Personal Representative" and a "Petition for Order Removing Trustee of Testamentary Trust, Requiring Accounting and Compelling Surrender of Assets." Following a hearing, these petitions were granted, and Layton was removed as executor on August 31, 1984. The court found that while Layton had not failed in his responsibilities to conserve Estate assets, he had failed through neglect and inattention to fulfill important and material requirements of his office as executor. The First District Court of Appeal, in an unpublished opinion, affirmed Layton's removal.

The hearing department found in aggravation that Layton's misconduct demonstrated a pattern of neglect of his responsibilities as executor and as attorney for the Estate, but the review department found that it did not. The review department agreed with the hearing department that Layton's misconduct had significantly harmed Johnson by depriving her of access to her rightful distribution from the trust for five years and, to a lesser extent, had harmed the Estate by incurring tax penalties and failing to earn interest on the Account. Moreover, the review department found that Layton was indifferent toward rectification or atonement.

In mitigation, both the hearing and review departments noted that Layton has no prior record of discipline over more than 30 years of practice, and that he obtained no personal gain from his misconduct. The record also shows that during much of the period of his misconduct, Layton's mother was suffering from terminal cancer and that Layton was under considerable emotional and physical strain from the need to care for her. The review department adopted the hearing department's finding that, while on the surface Layton has been cooperative and candid in these disciplinary proceedings, the contrary explanations he has given for his actions and omissions prevent this factor from carrying much weight.

The hearing department recommended that Layton be suspended from practice for three years, that execution of the suspension be stayed, and that Layton be placed on probation for five years subject to conditions including six months' actual suspension from practice. The review department also recommended three years' suspension, stayed, with five years' probation, but would impose only thirty days' actual suspension. Two members of the review department would have imposed no actual suspension.

## DISCUSSION

■ The review department adopted the hearing department's conclusion that Layton violated Rules of Professional Conduct, former rule 6-101(2) (eff. until Oct. 21, 1983) in wilfully failing to use reasonable diligence to handle matters relating to the House and to close the administration of the Estate with reasonable speed, and that he violated Rules of Professional Conduct, former rule 6-101(A)(2) (eff. Oct. 21, 1983) in intentionally or recklessly failing to perform legal services competently.[2] Both departments also found that Layton's misconduct violated Business and Professions Code section 6103 (violating oath and duties as an attorney is cause for disbarment or suspension).

■ While we must exercise independent judgment in determining the appropriate level of discipline to be imposed in any given case (*Greenbaum v. State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754]; *In re Chira* (1986) 42 Cal.3d 904, 909 [231 Cal.Rptr. 560, 727 P.2d 753]), we give great weight to the disciplinary recommendations of the review department (*In re Severo* (1986) 41 Cal.3d 493, 500 [224 Cal.Rptr. 106, 714 P.2d 1244]) and the factual findings of the hearing department. (*In re Kreamer* (1975) 14 Cal.3d 524, 532, fn. 5 [121 Cal.Rptr. 600, 535 P.2d 728].) Layton bears the burden of showing that the review department's recommendation is erroneous or unlawful. (Bus. & Prof. Code, § 6083, subd. (c); *Weber* v. *State Bar* (1988) 47 Cal.3d 492, 501 [253 Cal.Rptr. 573, 764 P.2d 701].) We do not believe that Layton has succeeded in discharging this burden.

■ Over five years elapsed from the time letters of administration were issued to Layton in this simple estate to the time he was removed by the court as executor, having failed to bring the Estate to closure. This delay in accomplishing the purposes for which he was retained was accompanied by numerous instances of lack of diligence in performing his duties as an attorney as well as his duties as an executor.

---

[2] See footnote 1, *ante*, at page 893.

Layton claims that his failure to rent or sell the House was the result, not of lack of diligence, but of decisions he made in consultation with Johnson. He claims he did not rent the House because he wanted to avoid problems with applicable rent control laws, because he wanted to leave the House available for occupancy by Johnson's children, and because the costs of storing Estate property left in the House and making repairs necessary to ready the House for occupancy by tenants would have been excessive. Layton claims that his failure to obtain an appraisal, rather than reflecting a lack of diligence, reflected his own expert opinion as an experienced residential landlord that the House should be held as an investment. We are not persuaded by Layton's explanations.

In view of the fact that Johnson urged Layton to consider renting the House, going so far as to locate prospective tenants, the decision not to rent must be laid at Layton's feet. We are not persuaded that because Layton may have managed family properties, his failure to rent the House was the result of his own assertedly expert opinion. Layton did not testify that he made any cost-benefit calculations relating to the prospect of renting the House. Rather, the record reflects a lack of diligence in considering the possibility. Furthermore, while Layton claims to have heard "horror stories" about rent control, he testified that these stories were about rent control laws in effect in Berkeley, California. While it may be true that Berkeley rent control laws are deemed controversial in some circles, that very fact makes it unlikely that they would have deterred Layton from renting the House, which is located in Oakland, California. Nor can Layton rely on the poor condition of the premises to excuse his failure to consider renting the House, inasmuch as the deterioration of the roof and the furnace were attributable to Layton's failure to take steps to repair these items.

Layton's claimed expertise in the management of *rental* property, in any event, does not explain his failure to investigate the economic wisdom of *selling* the House. If anything, his asserted decision that the House was not worth renting should have increased the attention he gave to the possibility of a sale. As the hearing department found, Layton failed even to investigate this possibility.

With regard to his failure to maintain the House properly, Layton complains that Johnson's sons should have undertaken such maintenance while they were living in the House rent-free. He further argues that at first he did not repair the roof because he reasonably expected that Johnson's sons would repair the roof themselves, or that they would assume the expense of having it done. Later, he claims, a sale of the House was being considered, and he thought that prospective buyers might prefer to take the House "as

is," and arrange for the necessary repairs themselves. We cannot credit these excuses.

The Finta brothers did not occupy the House until some time after Mrs. Spencer's death; Layton does not explain why he did nothing to see that the House was serviced by utilities in the interim, though he concedes that power should have been supplied to the House so as to give it an occupied appearance. More importantly, Layton provides no basis for his assertion that he expected that the Finta brothers would repair the roof and otherwise maintain the premises. They apparently had no legal obligation to do so; nor does Layton show that they indicated to him in any fashion that they would undertake these responsibilities. Layton's suggestion that he was considering an "as is" sale of the House cannot be reconciled with the hearing department's finding that Layton never investigated, nor took any steps towards, selling the House.

Layton admits that he allowed the insurance on the House to lapse, suggesting that his secretary probably misfiled the insurance bill. He points out that no actual loss occurred, and argues that, if it had, he would have been personally responsible for it. Layton notes that, since there was no actual loss, the net result to the Estate was a savings of premium payments. We are not persuaded that Layton's dereliction in failing to maintain the insurance is thus excusable.

Layton cannot escape responsibility for his failure to insure the house by blaming his secretary. An attorney has an obligation to adequately supervise his employees. (*Moore* v. *State Bar* (1964) 62 Cal.2d 74, 80-81 [41 Cal.Rptr. 161, 396 P.2d 577]. See also *Spindell* v. *State Bar* (1975) 13 Cal.3d 253, 262 [118 Cal.Rptr. 480, 530 P.2d 168, 80 A.L.R.3d 1231] and *Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 857 [100 Cal.Rptr. 713, 494 P.2d 1257].) Furthermore, Layton has offered nothing more than speculation to suggest that his secretary had in fact misfiled the insurance renewal notice. Nor does the fortuity that no loss occurred diminish the seriousness of Layton's dereliction in having left the Estate so vulnerable.

Layton claims he did not notify the postal service of his change of office address because he thought that the postal service would only forward mail for a limited period. He says he thought that, after this limited period, all Estate correspondence which arrived at the old address would be returned to its sender, thus depriving him of access to it. He claims he did not directly notify the Estate's correspondents of his office address because he did not know of their identities for a long time, and that some of them, in

particular certain financial institutions, would not accept the change of address. Layton also complains that Johnson had agreed to forward Mrs. Spencer's mail to him, and that she failed to inform him of her decision to stop doing so. Again, Layton's excuses are not persuasive.

Like the hearing department referee, we simply cannot imagine why, as Layton asserts, any significant number of the Estate's correspondents would refuse to acknowledge properly a submitted change of address. If individual correspondents had been properly apprised of Mrs. Spencer's death, or of a change in address for her mail and the appointment of Layton as her personal representative, the concern Layton claims to have felt about unforwarded mail would have been baseless. The record establishes that the primary reason Layton received Estate mail late, or failed, in some instances, to receive it at all, is that he was not diligent in providing correspondents and the postal service with routine notifications, and that he failed to make satisfactory arrangements with Johnson or anyone else to have mail forwarded to him when he abandoned his Oakland office.

Layton claims his failure to timely file the inventory and appraisement was not owing to a lack of diligence, but was attributable to a laundry list of factors: the decedent's bank accounts were difficult to locate, the title to some Estate assets was difficult to establish, the appraisal of the large music box took seven months, the inventory was misfiled by Layton's secretary, etc. Furthermore, Layton asserts that no purpose would have been served by the filing of a partial inventory.

As previously discussed, Layton's speculation that his secretary may have misfiled certain items cannot excuse his delay. As to any difficulty in locating or valuing certain assets, Layton is simply wrong to the extent he argues that a partial inventory could not have been employed to move the Estate forward. The statute requiring an inventory is directory, and does not render subsequent inventories invalid. (*In re Graber* (1896) 111 Cal. 432, 434 [44 P. 165]; *Phelan* v. *Smith* (1893) 100 Cal. 158, 169 [34 P. 667].) Thus, an executor need only file an inventory of those assets which have come to his possession or knowledge. (Prob. Code, § 600.) An executor should, therefore, file an inventory at the earliest possible moment and, if other property subsequently comes to his knowledge, he should file supplemental inventories from time to time. (*In re Graber's Estate* (1895) 2 Coffey's Prob. Dec. 345, 350.) Layton should have filed a partial inventory, rather than, as the review department found he did, cause detrimental delay in the closure of the Estate.

Layton claims he failed to timely file the Estate federal tax return because the appraisement was not available for a considerable time after the return was due. He argues that he intended to use the values fixed in the appraisement to complete the tax return, and only "in desperation" at being without those values to refer to, entered his own estimates on the tax return and submitted it. Layton acknowledges his late filing caused the Estate to incur penalties, but argues that they were less than amounts he saved the Estate by making the tax return on the basis of his own estimates, which were lower than the values ultimately assigned by the appraisement. Once again, Layton's explanations do not persuade us.

There was no need for Layton to delay filing the Estate's federal tax return. Layton claims he was waiting for the appraisement to return from the estate tax referee, from which he intended to extract values for use in preparing the tax return. But Layton concedes he ultimately filed the return using his own value estimates. He obviously could have inserted these estimates much earlier than he did. Furthermore, much of the delay in the appraisement's arrival is chargeable to Layton's own delay in submitting the inventory, as previously discussed. Nor is Layton's lack of diligence in filing the Estate's tax return excusable by the fortuity of the values he used having been accepted by the Internal Revenue Service even though they were less than those ultimately given in the appraisement. Layton admits he used these lower values only after a long delay. The Estate paid penalties and interest of approximately $4,000 that it would not have had to pay absent Layton's lack of diligence.

Layton contends that the Estate might have prevailed in opposing the levy placed upon its bank account by the Internal Revenue Service. He asserts that the levy was partially invalid as it included taxes already paid by Mrs. Spencer and that the late penalty was assessed up to the date the Internal Revenue Service received the estate tax return rather than up to the date Layton posted it. However, Layton also says it was his judgment that the expense of mounting such litigation would have exceeded the potential benefits.

Layton claims that the dividends from the Hutton Account accumulated in the non-interest-bearing account because that arrangement was preferable to having dividend checks mailed to him. He testified that the latter method would not have been in the Estate's interest because the checks would often take so long to reach him that they became stale. As previously noted, the hearing department referee had difficulty believing Layton's claim. We have the same difficulty. The record contains no evidence that the bank refused, or that Hutton stopped, payment on any such check.

Layton's explanation bears the hallmarks, at best, of an inventive rationalization. Because Layton permitted funds to accumulate in Hutton's non-interest-bearing account, on one occasion to more than $2,400, the Estate was deprived of a small amount of interest income it might have enjoyed absent Layton's lack of diligence.

Layton acknowledges he "forgot" about an interest payment of $5,200 made by Chartered Bank, with the result that the Estate accounts were out of balance for a long period by this amount, and the closure of the Estate was consequently delayed. He asserts that an accountant, such as that which Johnson's husband offered to hire, could not have located the discrepancy more quickly than Layton ultimately did. The record discloses no basis for such an assertion. Common sense suggests that Layton's persistent difficulty in locating the source of the $5,200 discrepancy should have suggested to him the advisability of seeking expert assistance, especially in the face of the delay it was causing in moving the Estate forward.

In respect of the hearing department's finding that Layton's lack of diligence delayed a distribution of the Estate to Johnson's detriment, Layton speculates that the probate court would have denied a petition for a preliminary distribution, owing to the lack of an appraisement. In any event, Layton claims, his failure to make a preliminary distribution did not harm the beneficiaries of the Estate because he did, albeit without court authorization, pay Johnson $3,000 of Estate funds.

At the time of Layton's conduct, the Probate Code permitted the executor of a decedent's estate to petition the court for distribution of any portion or portions of that estate two months after letters of administration were first issued. (Prob. Code, § 1000 [as operative until July 1, 1989].) Layton's speculation that the court would not have permitted such a partial distribution is not supported by the record. The Probate Code then provided that the court should order such partial distributions upon petition, when "it appears that . . . the estate is but little indebted and the . . . [petitioner's] share of the estate . . . may be distributed without loss to the creditors or injury to the estate or any person interested therein . . . ." (Prob. Code, § 1001 [as operative until July 1, 1989].) Layton simply failed diligently to take steps to obtain distribution of the Estate or any part thereof, despite Johnson's urgings and her expressed need for money.

We have repeatedly held that gross carelessness and negligence may constitute a violation of the oath of an attorney to discharge his duties to the best of his knowledge and ability. (See, e.g., *McMorris* v. *State Bar*

(1981) 29 Cal.3d 96, 99 [171 Cal.Rptr. 829, 623 P.2d 781]; *Simmons* v. *State Bar* (1970) 2 Cal.3d 719, 729 [87 Cal.Rptr. 368, 470 P.2d 352].) ■ Failure to communicate with, and inattention to the needs of, a client may, standing alone, constitute grounds for discipline. (*McMorris, supra,* 29 Cal.3d at p. 99; *Doyle* v. *State Bar* (1976) 15 Cal.3d 973, 978 [126 Cal.Rptr. 801, 544 P.2d 937].) ■ In cases involving failure, similar to petitioner's, to perform services diligently, we have not hesitated to impose actual suspension. (See, e.g., *Trousil* v. *State Bar* (1985) 38 Cal.3d 337 [211 Cal.Rptr. 525, 695 P.2d 1066] [six months' actual suspension for failure to represent clients diligently]; *McMorris, supra,* 29 Cal.3d 96 [one hundred and eighty days' suspension for three counts of failing to perform services for clients].) Layton's lack of diligence in failing to perform the services for which he was retained warrants similar discipline.

Layton's case is complicated by the fact that he served both as executor of the Estate, and as attorney to the Estate and the trust. An executor is not required to be an attorney, and executors are not, as such, subject to the Rules of Professional Conduct that govern attorneys. Layton's misconduct, however, is not insulated from scrutiny under the Rules of Professional Conduct merely because much of it was undertaken at least partly in his capacity as executor.

First, much of Layton's misconduct clearly encompassed actions taken in the capacity of an attorney. Second, where an attorney occupies a dual capacity, performing, for a single client or in a single matter, along with legal services, services that might otherwise be performed by laymen, the services that he renders in the dual capacity all involve the practice of law, and he must conform to the Rules of Professional Conduct in the provision of all of them. (*Crawford* v. *State Bar* (1960) 54 Cal.2d 659, 667-668 [7 Cal.Rptr. 746, 355 P.2d 490] [attorney provided title and brokerage services]; *Alkow* v. *State Bar* (1952) 38 Cal.2d 257, 263 [239 P.2d 871] [attorney provided collection services].)

Layton argues that throughout his administration of the Estate, he was accomplishing Mrs. Spencer's purposes as testator. He argues that though his skills in the area of probate law may fall below those of specialists in that field, he offers his clients the approach and attitude of a "family attorney," and that the value of this should be weighed in assessing his competence. He places great emphasis on the time and effort he devoted to investing and reinvesting Estate cash assets at high yields.

Layton's handling of the cash assets of the Estate is not at issue. The fact that he adequately invested these cannot excuse misconduct in his handling

of other matters connected with the Estate. Nor does Layton offer evidence that would permit us to conclude he provided Spencer, Johnson or the Estate special services or value by using a "family attorney" approach. Indeed, the record indicates that during much of the period at issue, Johnson had difficulty contacting Layton and that Layton often did not return Johnson's calls. We agree with the hearing department that Layton's claim that his conduct was consistent with Mrs. Spencer's intent may be made in subjective good faith, but it is so misguided that it can be given little weight.

■ Layton complains that the hearing department referee denied him a fair hearing by misleadingly stating that certain of the exhibits offered into evidence by the State Bar would be stricken, but later referring to those same exhibits in making his findings.

State Bar exhibit number 1 is the transcript of the February 27, 1984, hearing in Alameda County Superior Court in which Layton was removed as executor of the Estate; State Bar exhibit number 2 is the superior court file containing various documents relating to this hearing; State Bar exhibit number 3 is the Court of Appeal file relating to Layton's appeal from the judgment removing him. It is true that the hearing department decision makes reference to these exhibits.

Layton correctly notes that at one point in the proceedings, the hearing department referee stated, "Mr. Layton, I am going to strike the exhibits on the basis that they are not complete." The record does not reveal precisely which exhibits the referee meant. The referee did say, in reference to the exhibits he had just told Layton would be stricken, that "[t]hey are not in the clerk's or reporter's transcript." This suggests that the referee did not mean to indicate that he would strike State Bar exhibits numbers 1 (the superior court transcript) or 2 (the superior court file). He went on to explain that he did not regard as relevant any evidence that related to events beyond the date of Layton's removal as executor. Thus, it does not appear that Layton was misled into believing that exhibits numbers 1 or 2 (the superior court transcript and file) would be struck. As to exhibit 3 (the Court of Appeal file), Layton has not shown or, indeed, even attempted to show, that the referee's decision was prejudiced by reference to it. Nor does the hearing department's decision contain any reference to any of these exhibits that relates to conduct that occurred after Layton was removed as executor. Thus, it appears that the referee properly limited his consideration of these exhibits.

■ Layton further complains that he was denied a fair hearing because the referee limited Layton's examination of Johnson's attorney, Mr. Perna,

as to actions Perna took on behalf of the Estate after Layton had been removed as executor. Layton wanted to show that Perna, who had some experience in the probate law area, had handled certain matters relating to the Estate in a similar way to that in which Layton had tried to handle them. He argued that Perna was familiar with the standards of probate practice in that community. We agree with the hearing department referee when he ruled that Layton had not qualified Perna as an expert witness, and that, otherwise, testimony as to Perna's actions after the date of Layton's removal as executor was irrelevant to the issue of Layton's misconduct before that date.

Though we conclude that Layton's misconduct warrants discipline, we agree with the review department that Layton's culpability does not show a pattern of misconduct and that Layton's over 30 years of practice without prior disciplinary incident should be considered in assessing appropriate discipline.

### DISPOSITION

For the above reasons, it is ordered that Herbert F. Layton be suspended from the practice of law for a period of three years; that execution of the order for such suspension be stayed; and that Layton be placed upon probation for a period of three years upon all of the conditions of probation recommended by the review department, including the condition that during the first thirty days of said period of probation, Layton shall be suspended from the practice of law in the State of California. This order is effective upon the finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)

Petitioner's application for a rehearing was denied July 18, 1990, and the opinion was modified to read as printed above.