Filed 7/23/21; see concurring opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ANGELINA JOLIE, | No. B308958 |
| Petitioner, | (Super. Ct. No. BD646058) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| WILLIAM BRADLEY PITT, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Erick L. Larsh, Judge. Petition granted.

Bley & Bley, Samantha Bley DeJean, Stefani Radist; Greines, Martin, Stein & Richland, Robert A. Olson and Jeffrey Raskin for Petitioner.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Jillian N. London; Young Spiegel & Lee, Lance S. Spiegel; Elkins Kalt Weintraub Reuben Gartside, Anne C. Kiley; Young, Spiegel,

Hillman & Hosp, Lance S. Spiegel and Anne C. Kiley for Real Party in Interest.

_____

Angelina Jolie filed a statement of disqualification challenging Judge John W. Ouderkirk (Ret.), the privately compensated temporary judge selected by Jolie and William Bradley Pitt to hear their family law case, based on Judge Ouderkirk's failure to disclose, as required by the California Code of Judicial Ethics, several matters involving Pitt's counsel in which Judge Ouderkirk had been retained to serve as a temporary judge. Orange County Superior Court Judge Erick Larsh, sitting by assignment to decide the issue, ruled Jolie's statement of disqualification was untimely and the new information disclosed by Judge Ouderkirk would not cause a person aware of the facts to reasonably entertain a doubt that he was unable to be impartial.

In her petition for writ of mandate and supporting papers, Jolie argues her statement of disqualification was timely; Judge Ouderkirk's failure to make mandatory disclosures violated his ethical obligations; and, under the circumstances here, Judge Ouderkirk's ethical breach, when considered with the information disclosed concerning his recent professional relationships with Pitt's counsel, might cause an objective person, aware of all of the facts, reasonably to entertain a doubt as to Judge Ouderkirk's ability to be impartial. We agree, grant the petition and direct the superior court to vacate its order of November 16, 2020 denying the statement of disqualification and to enter a new order disqualifying Judge Ouderkirk from serving as a temporary judge in the underlying matter.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Selection of Judge Ouderkirk To Serve as a*
   *Temporary Judge and the Initial Disclosures*

Jolie filed for dissolution of her marriage to Pitt on September 19, 2016.  The parties selected Judge Ouderkirk, who had officiated at their wedding in France in August 2014, to serve as a temporary judge hearing the matter; and the superior court appointed Judge Ouderkirk as a temporary judge for all purposes on January 9, 2017.

On January 3, 2017, prior to Judge Ouderkirk's appointment, both Judge Ouderkirk and his alternative dispute resolution provider, Alternative Resolution Centers (ARC), made disclosures regarding privately compensated matters in which Judge Ouderkirk had been involved and in which Jolie's counsel, Laura A. Wasser, or her law firm, Wasser Cooperman & Mandles, or Pitt's counsel, Lance S. Spiegel, or his law firm, Young Spiegel & Lee, had served as counsel for one of the parties.  Judge Ouderkirk disclosed one such completed matter involving Wasser. He disclosed five completed matters involving Spiegel and two additional matters in which a lawyer from Spiegel's firm had represented one of the parties.  Judge Ouderkirk stated he was awaiting appointment in one additional case.  Judge Ouderkirk's disclosure letter also stated, "I will continue to consider accepting other cases as other additional cases may arise from time to time while the Jolie/Pitt case is still pending.  Such other cases might involve a party, lawyer, law firm and/or witnesses involved in the Jolie/Pitt matter."

ARC's disclosure letter identified six completed cases in which Spiegel or his law firm had been counsel for one of the parties, but only two of those cases were not included in

3

Judge Ouderkirk's disclosure report (making a total of 10 cases involving Spiegel or his firm, nine of which were completed). ARC did not identify any cases in which Judge Ouderkirk had been retained that involved Wasser.

The ARC letter, which erroneously referred to Judge Ouderkirk's role as a neutral engaged by the parties to act as an arbitrator (and, therefore, subject to a different set of rules regarding disclosure), contained the following statement: "To further comply with CCP section 1281.85 as adopted by the Judicial Council of California and effective as of July 1, 2002 *ARC* makes the following disclosure: If selected as a neutral arbitrator the Arbitrator selected in the instant matter will entertain and accept offers of permitted employment or new professional relationships from parties, attorneys, or law firms involved in a case while this case is pending. If the neutral arbitrator is appointed on this case, the neutral arbitrator will also inform the parties of any subsequent offer while this case is pending."

2. *Extension of Judge Ouderkirk's Appointment and the 2018 Disclosures*

Judge Ouderkirk's initial appointment expired on December 31, 2017. The parties and their counsel stipulated to the extension of that appointment, and on February 6, 2018 the superior court approved the stipulation and appointed Judge Ouderkirk to serve as a privately compensated temporary judge through December 31, 2018.

On May 8, 2018, after a new attorney associated in with Wasser as counsel for Jolie (Priya Sopori of Greenberg Glusker), ARC wrote counsel noting a hearing in the case was scheduled for May 16, 2018 and identifying six cases in which Judge Ouderkirk had been retained that involved counsel for the parties. Three of

4

the six matters had previously been disclosed in ARC's January 2017 letter. Of the three new matters, both Spiegel and Wasser were counsel in one; Spiegel was counsel in another (*In re Marriage of Levitan*); and Wasser's firm represented a party in the third.

Samantha Bley DeJean replaced Wasser as Jolie's lead counsel in August 2018. In response ARC again sent a disclosure letter to counsel, which repeated the disclosures from its May 8, 2018 letter. Judge Ouderkirk on August 30, 2018 also sent a supplemental disclosure letter. Judge Ouderkirk stated he had nothing to disclose regarding DeJean or the Law Offices of Bley and Bley and had been retained in a matter involving another of Jolie's new lawyers but the case had settled and his only participation was to sign the judgment. He also reported he had presided over the trial in the matter for which he had been awaiting appointment in January 2017. Judge Ouderkirk's letter again advised the parties, "I will continue to consider accepting other cases as other additional cases may arise from time to time while the Jolie/Pitt case is still pending. Such other cases might involve a party, lawyer, law firm and/or witnesses involved in the Jolie/Pitt matter."

3. *Case Developments*

In October 2018 the parties and their counsel (DeJean and Spiegel) stipulated to an extension of Judge Ouderkirk's appointment through June 30, 2019. The superior court approved the stipulation on November 5, 2018. The appointment was again extended by agreement and court order in November 2018 through December 31, 2019 and once again in September 2019 to the earlier of December 31, 2020 or six months following entry of judgment on all reserved matters (or through completion

5

of any requests for order pending on the date the appointment would otherwise expire).

A judgment for custody of the children was entered on November 21, 2018. A judgment for dissolution of marriage, status only, was entered on April 12, 2019. On June 20, 2020 Pitt filed a request for order seeking to change the custody and visitation provisions of the November 2018 judgment and requesting an evidentiary hearing. Jolie opposed the request. Trial was set for October 5, 2020.

4. *The Request for Additional Disclosures*

On July 21, 2020, after receiving Pitt's request for a new custody order and nearly two years since Judge Ouderkirk had made any disclosures, DeJean wrote ARC inquiring about additional matters in which Judge Ouderkirk may have been retained in which Pitt's counsel was also involved. ARC identified two new matters that were active into 2020 (*Merade*, in which Spiegel was counsel of record, and *Hankey*, which involved Anne C. Kiley, Spiegel's cocounsel for Pitt); a previously identified matter in which a hearing had been held in 2019 (*Levitan*); a 2017 case (*Lally-Arena*) that had not previously been disclosed; and a second, completed 2017 case (*Fisher*), which had been disclosed.

Upon receipt of ARC's disclosures, DeJean wrote Judge Ouderkirk asking for details of the matters included in the ARC letter, requesting that Judge Ouderkirk identify any additional matters in which he had been involved with Spiegel, Kiley or their law firms, reminding Judge Ouderkirk of his duties of disclosure and stating, "Such ongoing professional relationships for privately compensated judicial or quasi-judicial officers create an appearance of impropriety."

6

In his response Judge Ouderkirk made several corrections and additions to matters identified in the ARC disclosure. As to *Levitan*, which Judge Ouderkirk described as "remarkably high value and hotly contested," Judge Ouderkirk stated the case had been reported to him as settled. His involvement prior to that time was extremely limited. His appointment had thereafter been extended in 2019 to decide a postjudgment reserved financial issue. That issue was never presented to him. It was subsequently established that Spiegel had requested a further extension of Judge Ouderkirk's appointment in *Levitan*; that request was opposed and ultimately denied by the court.

According to Judge Ouderkirk, *Merade* was a single-issue custody matter that required only "a few hours of court time." The engagement began in April 2019 and ended in February 2020. Inclusion of *Lally-Arena* in the ARC disclosure was a mistake; Spiegel's firm was not involved. Finally, Judge Ouderkirk explained the *Hankey* case, where his involvement began in 2017 and continued until his appointment expired on June 1, 2020, had not previously been disclosed because Kiley did not substitute in until December 2019 (as the most recent of her client's many new lawyers).

5. *Jolie's Efforts To Disqualify Judge Ouderkirk*

On August 7, 2020, two days after receiving Judge Ouderkirk's response, Jolie asked Judge Ouderkirk to recuse himself based on the undisclosed ongoing professional relationships with Pitt's counsel. When Judge Ouderkirk did not recuse himself, Jolie filed a verified statement of disqualification in superior court, asserting a reasonable person would entertain a doubt whether Judge Ouderkirk could be impartial in the proceedings in light of his failure to disclose multiple

professional, business and financial relationships, ongoing during the course of the matter, with Pitt's counsel and their law firms.

Pitt filed an opposition to Jolie's statement of disqualification, contending the request "is a thinly veiled attempt by Jolie to delay the adjudication of long-pending custody issues," and asserting Judge Ouderkirk had complied with "all standard ethical practices and rules."

On August 18, 2020 Judge Ouderkirk filed a verified answer to Jolie's statement of disqualification. After a detailed description of the factual background, Judge Ouderkirk asserted he and ARC had made all required disclosures in a timely manner at the time of his initial appointment. As to subsequent disclosures, Judge Ouderkirk insisted that the pertinent canon of the California Code of Judicial Ethics "does not set any specific time limitation for disclosure other than to state that disclosure is required from: '. . . the time of notice and acceptance of appointment until termination of the appointment.'"

Specifically with respect to *Levitan*, Judge Ouderkirk noted it had previously been disclosed (in May and August 2018) and quoted the explanation in his August 5, 2020 letter to DeJean that, although his appointment in the case had been extended after the earlier disclosures, he had not actually heard any additional issues in the matter. Judge Ouderkirk described as "beyond any reasonable inference" the suggestion there was anything inappropriate about Spiegel's request that the court further extend that appointment. As for his recent involvement in the *Merade* and *Hankey* cases, Judge Ouderkirk stated they "were included in the July 24, 2020 supplemental disclosures made promptly upon Petitioner's request and discussed in the August 5, 2020 reply to the July 27, 2020 inquiry by Petitioner's

8

counsel. [Fn. omitted.] These disclosures comply with the disclosure requirements of Canon 6D(5)(a) which does not set any specific time limitation for disclosure other than to state that disclosure is required from: '. . . the time of notice and acceptance of appointment until termination of appointment.' July 24, 2020 was certainly within the relevant time frame. Could these disclosures have been made sooner? Clearly, they could have been and were overlooked in the administrative process. When brought to Judge Ouderkirk's attention they were instantly disclosed and the circumstances surrounding each case were explained to Petitioner's counsel in response to her request for more information." Judge Ouderkirk added, "Petitioner does not explain how these two matters, Hankey and Merade, standing alone without any more information would somehow cause an impartial observer to disregard the consistent, voluminous, overwhelming and ongoing disclosures made by Judge Ouderkirk since the inception of the Jolie/Pitt case." Judge Ouderkirk concluded by stating, "I can and will remain impartial in this action."

6. *The Superior Court's Order Denying Disqualification*

Pursuant to Code of Civil Procedure section 170.3, subdivision (c)(5),[1] the Chief Justice, as chair of the Judicial Council, selected Judge Larsh of the Orange County Superior Court to hear and determine the question of disqualification. In an order filed November 16, 2020, Judge Larsh denied disqualification, ruling Jolie's statement of disqualification was untimely: "The disclosures in 2017 and 2018 put Petitioner on notice that Judge Ouderkirk had a significant history of serving

---

[1]     Statutory references are to this code.

9

as a dispute neutral in cases in which Mr. Spiegel or his firm served as counsel. By August 2018, Petitioner was aware of facts that might cause her to reasonably entertain a doubt that Judge Ouderkirk would be able to be impartial," noting that, even after those disclosures, the parties again twice stipulated to extend Judge Ouderkirk's appointment. Judge Larsh also ruled that the 2020 disclosures "did not substantially change from the 2018 disclosures. . . . None of these disclosures would cause a person aware of the facts to reasonably entertain a doubt that Judge Ouderkirk was unable to be impartial." Judge Larsh also stated the fact that DeJean practices in San Francisco and was unlikely to retain Judge Ouderkirk for future cases was irrelevant.

7. *Jolie's Petition for Extraordinary Writ*

On November 20, 2020 Jolie petitioned this court for a writ of mandate, compelling the superior court to vacate its order and to issue a new order disqualifying Judge Ouderkirk. (See § 170.3, subd. (d) [determination of the question of the disqualification of a judge "may be reviewed only by a writ of mandate from the appropriate court of appeal"].) Jolie also requested an immediate stay of proceedings in the child custody and visitation dispute, which were then scheduled to begin on November 30, 2020.[2] Pitt filed an opposition to the request for a stay[3] and an opposition to the petition for extraordinary writ.

---

[2] Judge Ouderkirk denied Jolie's request to stay trial of the custody matter during the pendency of the writ proceedings.

[3] Although opposing Jolie's request for a stay, in his return to the order to show cause Pitt agreed with Jolie's contention that, if this court determines that Judge Ouderkirk is disqualified, that disqualification is retroactive to August 7, 2020, the date Jolie filed the statement of disqualification, and any

On December 9, 2020 we issued an order to show cause why the relief Jolie requested should not be granted. We denied Jolie's request for a stay of proceedings before Judge Ouderkirk.[4]

**DISCUSSION**

1. *Governing Law*

Article VI, section 21 of the California Constitution authorizes the superior court to designate a member of the State Bar of California, selected by the parties to a lawsuit, to serve as a "temporary judge," exercising full judicial powers in their case: "On stipulation of the parties litigant the court may order the cause to be tried by a temporary judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause."[5] Upon appointment, a temporary judge "must take

---

ruling by Judge Ouderkirk in the interim will be void *ab initio*, as provided in section 170.4, subdivision (c)(1).

[4]  After issuance of our order to show cause, Judge Ouderkirk presided at an extended evidentiary hearing on Pitt's request for a modified custody and visitation order. We deny Pitt's motions for judicial notice of the May 13, 2021 and June 29, 2021 rulings issued by Judge Ouderkirk and his June 29, 2021 statement of decision as not relevant to the issues before us.

[5]  Article VI, section 21 of the California Constitution does not refer to a "privately compensated" temporary judge. That term first appeared in California Rules of Court, former rules 244 and 880, effective July 1, 1993, adopted by the Judicial Council based on recommendations to govern the conduct of privately paid judges acting as temporary judges from the Advisory Committee on Private Judges appointed in 1989 by Chief Justice Malcolm M. Lucas, as revised by an Ad Hoc Committee of Judicial Council members subsequently appointed by the Chief Justice. (Judicial Council of Cal., Admin. Off. of Cts., Rep. on

Rules to Implement Recommendations of the Ad Hoc Committee on Private Judges (1993) pp. 1-2.)

In its February 1993 report to the Judicial Council, the Ad Hoc Committee explained its proposals "do not address one point raised in comments that particularly troubled the committee. Judge James Ford of the Sacramento County Superior Court asserted that Penal Code section 94 prohibits a 'judicial officer,' including a temporary judge, from collecting a fee without statutory authorization. While there is no statutory authorization for fees for temporary judges, there is statutory authorization for referees to collect fees [citation]." The committee recommended the Judicial Council circulate for public comment a further amendment to the rules relating to temporary judges that would prohibit temporary judges from being paid by the parties except when serving as a referee. Temporary judges being paid by the court or serving without compensation would not be affected by the proposed amendment. (Judicial Council of Cal., Admin. Off. of Cts., Rep. on Rules to Implement Recommendations of the Ad Hoc Committee on Private Judges, *supra,* pp. 6-7.)

The proposed rule prohibiting payment of temporary judges by the parties was not adopted. To the contrary, in response to the question raised concerning whether privately compensating temporary judges violated Penal Code section 94, the Legislature amended that statute, effective January 1, 1994, to provide, "The lawful compensation of a temporary judge shall be prescribed by Judicial Council rule." (Stats. 1993, ch. 909, § 13, p. 5106.) Effective July 1, 1995 the Judicial Council added subdivision (g) to former rule 244, providing, "Temporary judges shall serve without compensation, unless the parties agree in writing to a rate of compensation to be paid by the parties, and that rate shall be allowed." Current rule 2.832 now provides in similar language, "A temporary judge selected by the parties may not be compensated by the parties unless the parties agree in writing on a rate of compensation that they will pay."

and subscribe the oath of office and certify that he or she is aware of and will comply with the applicable provisions of canon 6 of the Code of Judicial Ethics and the California Rules of Court." (Cal. Rules of Court, rule 2.831(b).)[6]

Pursuant to canon 6D(3)(a)(vii)(C),[7] a temporary judge must "from the time of notice and acceptance of appointment until termination of the appointment," disqualify himself or herself if, for any reason, "a person aware of the facts might reasonably entertain a doubt that the temporary judge would be able to be impartial." This disqualification mandate is reinforced by canon 6(D)(5)(a), which requires a temporary judge, "from the time of notice and acceptance of appointment until termination of the appointment," to disclose in writing or on the record "information that is reasonably relevant to the question of disqualification under Canon 6(D)(3), including personal or professional relationships known to the temporary judge . . . that

---

[6] References to rules are to the California Rules of Court. References to canons are to the California Code of Judicial Ethics.

[7] Canon 6D applies to a privately compensated temporary judge appointed to serve as a judge pursuant to article VI, section 21 of the California Constitution, a person serving as a referee pursuant to Code of Civil Procedure sections 638 or 639 and court-appointed arbitrators. It does not apply to privately compensated neutrals in contractual arbitrations, who are separately governed by the California Rules of Court, Ethics Standards for Neutral Arbitrators in Contractual Arbitration adopted by the Judicial Council. (§ 1281.85, subd. (a); see *Roussos v. Roussos* (2021) 60 Cal.App.5th 962, 971.)

For clarity, when discussing or quoting from canon 6, we omit the references to referees and court-appointed arbitrators.

13

he or she or his or her law firm has had with a party, lawyer, or law firm in the current proceeding, even though the temporary judge . . . concludes that there is no actual basis for disqualification."

Rule 2.831(d), applicable specifically to temporary judges requested by the parties pursuant to Article VI, section 21 of the California Constitution, requires that matters subject to disclosure to the parties under the Code of Judicial Ethics must be disclosed no later than five days after designation as a temporary judge or, as to matters not known at the time of designation, "as soon as practicable thereafter."

Rule 2.831(e) provides a temporary judge must disqualify himself or herself as "required by law" and "as provided under the Code of Judicial Ethics." Neither the pertinent provisions of the Code of Civil Procedure nor the Code of Judicial Ethics creates an automatic or per se rule of disqualification for a judge's failure to make a required disclosure. (See, e.g., *Wechsler v. Superior Court* (2014) 224 Cal.App.4th 384, 387 [judge not disqualified for failing to disclose potentially disqualifying information absent additional facts, even though disclosure required under canon 3E(2)(a)]; see also *Hayward v. Superior Court* (2016) 2 Cal.App.5th 10, 74 (dis. opn. of Richman, J.).) Rather, the facts surrounding the failure to timely make a required disclosure and the information ultimately disclosed must be evaluated under section 170.1, subdivision (a)(6)(A)(iii), which requires a judge, including a temporary judge, to disqualify himself or herself if "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial," and, for a temporary judge, under canon 6D(3)(a)(vii)(C), which contains identical language.

"The standard for disqualification provided for in subdivision (a)(6)(C) of section 170.1 is fundamentally an objective one. It represents a legislative judgment that due to the sensitivity of the question and inherent difficulties of proof as well as the importance of public confidence in the judicial system, the issue is not limited to the existence of an actual bias. Rather, if a reasonable man would entertain doubts concerning the judge's impartiality, disqualification is mandated. 'To ensure that the proceedings appear to the public to be impartial and hence worthy of their confidence, the situation must be viewed through the eyes of the objective person.' [Citations.] While this objective standard clearly indicates that the decision on disqualification not be based on the judge's personal view of his own impartiality, it also suggests that the litigants' necessarily partisan views not provide the applicable frame of reference. [Citations.] Rather, 'a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street.'" (*United Farmworkers of America v. Superior Court* (1985) 170 Cal.App.3d 97, 104, fn. omitted; accord, *Wechsler v. Superior Court, supra,* 224 Cal.App.4th at p. 391 ["[t]he applicable disqualification standard is an objective one: if a fully informed, reasonable member of the public would fairly entertain doubts that the judge is impartial, the judge should be disqualified"]; see *People v. Freeman* (2010) 47 Cal.4th 993, 1000-1001 [the statutory disqualification scheme in the Code of Civil Procedure "is not *solely* concerned with the rights of the parties before the court but is also 'intended to ensure public confidence in the judiciary'"].)

"'Impartiality' entails the 'absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as

well as maintenance of an open mind.' [Citation.] In the context of judicial recusal, '[p]otential bias and prejudice must clearly be established by an objective standard.'" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 389 (*Haworth*); accord, *People v. Chatman* (2006) 38 Cal.4th 344, 363 ["[p]otential bias and prejudice must clearly be established by an objective standard"]; *Wechsler v. Superior Court*, *supra*, 224 Cal.App.4th at p. 391.)

2. *Standard of Review*

In *People v. Alvarez* (1996) 14 Cal.4th 155, rejecting a claim by the appellant in a capital case that the trial judge had personal knowledge of disputed evidentiary facts, a ground for disqualification under section 170.1, subdivision (a)(1)(A), the Supreme Court stated, "As a general matter, an appellate court reviews a trial court's ruling on a recusal motion for abuse of discretion." (*Alvarez*, at p. 237.) Pitt contends we are bound by *Alvarez* and must apply an abuse of discretion standard in reviewing the superior court's order denying disqualification of Judge Ouderkirk.

Despite the general statement in *Alvarez*, more recently in *Haworth*, *supra*, 50 Cal.4th 372 the Supreme Court observed that its decisions "have not fully resolved" the applicable standard of review in judicial recusal cases involving the appearance of partiality. (*Id.* at p. 383, fn. 8.)[8] The *Haworth* Court then held a

---

8        The full *Haworth* footnote states, "Because the rule for disclosure by a neutral arbitrator under section 1281.9, subdivision (a) is the same as the rule for disqualification of a judge under section 170.1, subdivision (a)(6)(A)(iii), case law applicable to judicial disqualification is potentially relevant to the present case. Our decisions, however, have not fully resolved, in the analogous context of judicial recusal, the issue of which

16

de novo standard of review should be used to determine in the analogous context of private contractual arbitration whether an arbitrator had failed to disclose information creating an appearance of bias.  (*Id.* at p. 383.)

As a threshold matter, the Supreme Court stated, the facts were not in dispute.  (*Haworth v. Superior Court, supra,* 50 Cal.4th at p. 383.)  Neither was the applicable law, making the question a mixed one of law and fact.  (*Id.* at p. 384.)  "In most instances," the Court explained, "mixed questions of fact and law are reviewed de novo—with some exceptions, such as when the

standard of review applies to a determination involving the appearance of partiality.  We stated in *People v. Alvarez*[, *supra,*] 14 Cal.4th [at p.] 237, that generally, 'an appellate court reviews a trial court's ruling on a recusal motion for abuse of discretion.'  *Alvarez,* however, does not appear to have been cited by this court or the Courts of Appeal on this point.  An earlier case, *People v. Brown* (1993) 6 Cal.4th 322, 336-337, has been cited for the proposition that a trial court's ruling on a motion to disqualify a judge is reviewed de novo.  (See *Flier v. Superior Court* (1994) 23 Cal.App.4th 165, 171.)  Although our opinion in *People v. Brown* does not express deference to the trial court's ruling, it does not explicitly set forth any standard of review.  Some appellate courts have stated, with minimal analysis, that the question of whether a judge should have been disqualified because of an appearance of partiality is a question of law, reviewable de novo, where the facts are not in dispute.  (See, e.g., *Briggs v. Superior Court* (2001) 87 Cal.App.4th 312, 319 ['On undisputed facts this is a question of law for independent appellate review.']; *Sincavage v. Superior Court* (1996) 42 Cal.App.4th 224, 230 ['Where, as here, the underlying events are not in dispute, disqualification on this ground becomes a question of law which this court may determine.'].)"  (*Haworth, supra,* 50 Cal.4th at p. 383, fn. 8.)

17

applicable legal standard provides for a "'strictly factual test, such as state of mind.'" [Citation.] "'This is so because usually the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles.'"" (*Id.* at p. 385.) Using this analysis, whether the disclosure at issue was required—that is, whether the information would create an appearance of bias—was properly reviewed de novo: "The applicable rule provides an objective test by focusing on a hypothetical reasonable person's perception of bias. The question is not whether Judge Gordon actually was biased or even whether he was likely to be impartial; those questions involve a subjective test that appropriately could be characterized as primarily factual. The question here is how an objective, reasonable person would view Judge Gordon's ability to be impartial." (*Id.* at pp. 385-386.)

The question before us likewise involves undisputed facts and the identical governing legal standard that requires an objective assessment of how a reasonable person would view Judge Ouderkirk's ability to be impartial—a mixed question of fact and law. We properly review the issue de novo. (See *Wechsler v. Superior Court*, *supra*, 224 Cal.App.4th at pp. 391-392 ["[t]he weight of authority supports that where, as here, the relevant facts are undisputed, a de novo review standard applies to a section 170.1(a)(6)(A)(iii) challenge to a claimed appearance of partiality"]; *Briggs v. Superior Court* (2001) 87 Cal.App.4th 312, 319; *Flier v. Superior Court* (1994) 23 Cal.App.4th 165, 171; see also *People v. Superior Court* (*Olivo*) (2019) 36 Cal.App.5th 942, 947 ["[w]here the underlying material facts are not in dispute, we review the trial court's order denying a peremptory challenge de novo"].)

Similarly, the question whether Jolie presented her statement of disqualification "at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification," as required by section 170.3, subdivision (c)(1), requires an evaluation of undisputed facts in light of an objective standard and, therefore, is also subject to de novo review.  (See generally *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 ["to the extent a mixed question requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted"]; *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175-1176 [when a controversy over whether a criterion has been met presents a mixed question and the material facts are largely undisputed, the issue is treated as a question of law and reviewed de novo]; *Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 604 ["[q]uestions of statutory interpretation, and the applicability of a statutory standard to undisputed facts, present questions of law, which we review de novo"].)

3. *The Statement of Disqualification Was Timely Filed*

Section 170.3, subdivision (c)(1), provides, if a judge who should recuse himself or herself refuses to do so, any party may file in superior court a written verified statement objecting to continued proceedings before the judge.  The subdivision further provides, "The statement shall be presented at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification."

A delay in seeking to disqualify a judge "constitutes forfeiture or an implied waiver of the disqualification."

19

(*Tri Counties Bank v. Superior Court* (2008) 167 Cal.App.4th 1332, 1337 [motion to disqualify judge for improperly undertaking independent investigation of facts denied when party was aware of misconduct but only raised issue after adverse ruling in case]; see *Hayward v. Superior Court*, *supra*, 2 Cal.App.5th at p. 49 ["parties can waive disqualification by their conduct where they are aware of grounds for disqualification but continue to participate in the proceedings without raising the objection"].) However, as this court held in the closely related context of the disclosure obligations of privately compensated neutrals, "[a] party cannot waive a right she does not know she has." (*Honeycutt v. JPMorgan Chase Bank, N.A.* (2018) 25 Cal.App.5th 909, 931 (*Honeycutt*).)

As discussed, in ruling Jolie's August 7, 2020 statement of disqualification was not timely filed, Judge Larsh found that Judge Ouderkirk's disclosures when first appointed in 2017 and thereafter in May and August 2018 put Jolie on notice that Judge Ouderkirk had a significant history of serving in cases in which Spiegel or other lawyers from his firm represented one of the parties. True, but history is different from current events.

Jolie first learned in late July 2020 that, in addition to Judge Ouderkirk's past professional relationships with Pitt's counsel, he had been engaged for two new matters—trial of a custody matter in *Merade* in which Spiegel represented a party, and a hearing on child support and fees in *Hankey* in which Kiley was cocounsel for a party— as well as a continuing role in *Levitan* after the case had apparently been settled. And Jolie acquired this new information only because her counsel asked whether Judge Ouderkirk had any new engagements to report,

20

not because Judge Ouderkirk had complied with his obligation under the Code of Judicial Ethics to make the disclosures.

Jolie's challenge to Judge Ouderkirk, as she has explained, is not predicated on his past professional relationships with Pitt's counsel—as repeatedly pointed out, Judge Ouderkirk also had been retained in matters in which Jolie's original counsel represented a party—but on the expansion of that relationship while this case was before him, as well as his failure to disclose those additional matters. Upon receiving this new information, Jolie promptly sought disqualification of Judge Ouderkirk, first asking him to recuse himself pursuant to canon 6D(3)(a)(vii)(C) and then filing her verified statement of disqualification in superior court. Jolie properly sought to disqualify Judge Ouderkirk based on information first learned in late July 2020; she was entitled to have her challenge decided on its merits.

4. *Judge Ouderkirk Failed To Comply with His Continuing Ethical Obligation To Disclose Professional Relationships with the Parties or Their Counsel*

As discussed, canon 6(D)(5)(a) requires a temporary judge to disclose information reasonably relevant to the question of disqualification, specifically including personal or professional relationships with a party or lawyer in the current proceeding, "from the time of notice and acceptance of appointment until termination of the appointment." The Code of Judicial Ethics could not make any clearer that this is a continuing obligation. New professional engagements to hear a case as a neutral or temporary judge in which the lawyer for a party in a pending case is also counsel of record in the new case must be disclosed.

21

In his verified answer to Jolie's statement of disqualification, Judge Ouderkirk did not dispute his participation in the *Merade* and *Hankey* cases fell within the mandatory disclosure requirements of canon 6. But he insisted he did disclose his role in those two cases, even though he never volunteered the information, revealing it only in answer to a specific inquiry from Jolie's counsel. Further, despite notifying the parties months after disclosure was necessary, he claimed his response was timely because the canon does not specify when a disclosure must be made other than from the time of notice and acceptance of appointment until termination of appointment. Judge Ouderkirk asserts, "July 24, 2020 was certainly within the relevant time frame"—meaning, apparently, that so long as he disclosed those matters before his appointment ended, he satisfied canon 6.

Judge Ouderkirk's narrow view of his ethical disclosure obligations ignores the requirements of rule 2.831(d), which he acknowledged when appointed and repeatedly certified he would follow.[9] Rule 2.831(d) provides, "[N]o later than five days after designation as a temporary judge or, if the temporary judge is not aware . . . of a matter subject to disclosure at that time, as soon

---

[9] As discussed, rule 2.831(b) requires a temporary judge, before proceeding in a case, to certify that he or she is aware of and will comply with applicable provisions of canon 6 and the Rules of Court. In his verified answer Judge Ouderkirk acknowledged that, as part of the required process for his appointment, on January 6, 2017 he signed a consent to act as temporary judge and certified he would comply with the applicable provisions of canon 6 and with rule 2.831, a certification repeated with each successive appointment in the case.

as practicable thereafter, a temporary judge must disclose to the parties any matter subject to disclosure under the Code of Judicial Ethics." "As soon as practicable" certainly does not mean at any time during the temporary judge's tenure, as Judge Ouderkirk suggested; nor does it mean promptly when (if) asked or even periodically, such as when new counsel makes an appearance in the case. Rather, the temporary judge's obligation under rule 2.831 and canon 6 is to disclose those matters that must be disclosed as quickly as possible and practicable, that is, taking into account the circumstances of a specific situation. For example, Judge Ouderkirk explained his week-plus delay in responding to DeJean's July 27, 2020 email requesting details of his new engagements with Pitt's counsel was due to his being away on vacation and then conducting a one-day hearing on an unrelated matter. Judge Ouderkirk's answer to DeJean's inquiry qualifies as having been made as soon as practicable. Disclosure in late July 2020 of participation in matters involving Pitt's counsel that began no later than 2019 and continued into 2020 does not.

As the court of appeal explained in *Benjamin, Weill & Mazer v. Kors* (2011) 195 Cal.App.4th 40 in the analytically similar context of privately compensated dispute resolution neutrals, disclosure of ongoing professional relationships with a party or counsel appearing in the proceeding is intended "to diminish the advantage steady customers have over one-time customers, and in that manner protect the integrity of private arbitration." (*Id.* at p. 69.) That rationale is at least equally applicable to use of privately compensated temporary judges. Indeed, because a temporary judge, unlike a private arbitrator, performs public judicial functions, protecting the integrity of the

proceedings by promptly making mandatory disclosures is even more important.  (See canon 6(D)(1) [specifically requiring a temporary judge to comply, inter alia, with canon 1 ("[a] judge shall uphold the integrity and independence of the judiciary") and canon 2A ("[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary")]; see also *Hayward v. Superior Court*, *supra*, 2 Cal.App.5th at p. 52 ["[P]rivate judges are not insulated in the way public judges are: Unlike public judges, they often have continuing and reciprocal business relationships with the lawyers who appear before them. Because private judges operate within a system in which potential conflicts are likely, adherence to requirements for written or on the record disclosure and waiver is imperative"].)

Canon 6D(5)(a) expressly states that information concerning personal or professional relationships with a lawyer in the current proceeding "is reasonably relevant to the question of disqualification under Canon 6D(3)."  As discussed, canon 6D(3) provides that disqualification can occur at any time from the time of notice and acceptance of appointment as a temporary judge until termination of the appointment.  That is, disqualification of a temporary judge who appears unable to be impartial is a continuing right of a party, not simply at the time of the initial appointment.  Ongoing disclosure on a timely basis is essential for that right to be meaningful.

Judge Ouderkirk's attempt to excuse his ethical lapse by asserting in his verified answer that the *Merade* and *Hankey* cases "were overlooked in the administrative process" falls short on several counts.  First, to the extent Judge Ouderkirk seeks to lay blame on ARC, his ADR provider, or its administrative staff,

24

it was he who was appointed a temporary judge and assumed the ethical obligations associated with that role. No more than an attorney can excuse his or her misconduct by blaming an assistant, Judge Ouderkirk must accept responsibility for the ethical violation that occurred here. (See canon 6D(2)(a) [a temporary judge must comply with canon 3C(1) requiring the discharge of administrative responsibilities without bias and with competence]; cf. *Layton v. State Bar* (1990) 50 Cal.3d 889, 900 [an attorney cannot escape responsibility for his breach of ethics by blaming his secretary]; *Honeycutt*, *supra*, 25 Cal.App.5th at p. 929, fn. 12.)

Second, no database search, sophisticated record compilation or other administrative action was required for Judge Ouderkirk to become aware of his participation in two new matters in which Pitt's counsel represented one of the parties. He presided at hearings where these lawyers appeared, either in person or virtually. While he may have overlooked his obligation to disclose this information to Jolie's counsel, he had the information at hand.[10]

Finally, the history of disclosures by Judge Ouderkirk and ARC in this case belies the suggestion the *Merade* and *Hankey* cases or the extension of Judge Ouderkirk's appointment in *Levitan* would have been disclosed but for somehow being inadvertently overlooked. Judge Ouderkirk's and ARC's practice

---

[10] In fact, if Judge Ouderkirk made the required initial disclosures in *Merade* before his engagement in that matter in April 2019, he would have advised counsel he was serving as temporary judge in the Jolie/Pitt case in which Spiegel represented Pitt. All he needed to do was simultaneously notify the Jolie/Pitt counsel of his role in *Merade*.

was to provide disclosures at the initiation of the engagement and when new counsel was associated or substituted into the case, as Pitt advised Judge Larsh in a brief filed in opposition to Jolie's statement of disqualification, not whenever a new event occurred requiring disclosure under canon 6. Simply put, that practice, whatever its purported justification, does not comply with a temporary judge's ethical obligations.

### 5. *A Person Aware of the Facts Might Reasonably Entertain a Doubt that Judge Ouderkirk Would Be Impartial*

As Judge Larsh found, by August 30, 2018, after DeJean had replaced Wasser as Jolie's lead counsel and Judge Ouderkirk sent a supplemental disclosure letter, Jolie was on notice that Judge Ouderkirk had a significant history of serving (and being privately compensated) in cases in which Spiegel or other lawyers from his firm represented one of the parties. The reports from Judge Ouderkirk and ARC indicated Judge Ouderkirk had participated in six or seven matters in 2012 and 2013 and another four or five in 2016 and 2017.[11] Neither ARC's nor Judge Ouderkirk's August 2018 report identified any still-active matter with the possible exception of *Levitan*, although Judge Ouderkirk himself believed that matter had concluded.[12] ,

---

[11] Because several of Judge Ouderkirk's cases apparently continued and were included more than once in the various reports, counting cases involves a bit of a subjective element. The precise number of completed cases in which Spiegel or his firm appeared before Judge Ouderkirk prior to August 2018, however, is not material.

[12] The August 27, 2018 disclosure report from ARC identified the *Levitan* matter with an October 2018 date and the notation "Set." The parties dispute whether "Set" was reasonably interpreted by Jolie's counsel as meaning the case had settled.

26

Jolie also knew her original counsel had previously been involved in two or three matters in which Judge Ouderkirk had served as a privately compensated temporary judge. What she did not know was, in the period after entry in November 2018 of the parties' stipulated custody judgment and before Pitt's June 2020 formal request for an order modifying that judgment—modifications adamantly opposed by Jolie—Pitt's counsel had been engaged in two contested hearings in which Judge Ouderkirk served as a privately compensated temporary judge, each of which had continued into 2020, nor did she know Pitt's counsel in that same period had advocated in court, over objection, for an extension of Judge Ouderkirk's designation as a privately compensated temporary judge in a third matter (*Levitan*).

### a. Honeycutt *does not control*

Did Judge Ouderkirk's participation as a temporary judge in *Merade* and *Hankey* and his failure to voluntarily disclose his role in those cases as required by canon 6 and rule 2.831(d), together with Spiegel's undisclosed activity in *Levitan,* require his disqualification? Relying principally on the holding and analysis in *Honeycutt, supra,* 25 Cal.App.5th 909, Jolie insists the answer must unequivocally be yes.

In *Honeycutt* this court vacated an arbitration award because the arbitrator had failed to make disclosures required by

---

However, as discussed, in his August 5, 2020 response to DeJean's July 27, 2020 letter asking for details about the additional cases ARC had identified, Judge Ouderkirk stated *Levitan* had, in fact, been reported to him as settled. His appointment had thereafter been extended in 2019 with the intention he would hear a reserved financial issue.

the California Rules of Court, Ethics Standards for Neutral Arbitrators in Contractual Arbitration (Ethics Standards) and included a stern admonition: "The arbitrator disclosure rules are strict and unforgiving. And for good reason. Although dispute resolution provider organizations may be in the business of justice, they are still in business. The public deserves and needs to know that the system of private justice that has taken over large portions of California law produces fair and just results from neutral decision makers." (*Honeycutt*, *supra*, 25 Cal.App.5th at p. 931.) Arguing the policies underlying mandatory disclosure requirements for dispute resolution neutrals, and specifically those disclosures intended to address the repeat-player problem, should fully apply to privately compensated temporary judges, Jolie asserts the rules and standards for disqualifying "*public*-actor, party-paid temporary Superior Court judges cannot be less stringent than those for disqualifying purely private-actor arbitrators."

We agree with the major premise of Jolie's argument. Ethical breaches by a privately compensated temporary judge serving as a public official are far more disquieting than similar violations by private arbitrators. But Jolie's reliance on *Honeycutt* overlooks a significant difference between the manner in which the Ethics Standards operate and the requirements and consequences of breaches of canon 6.

Standard 12 of the Ethics Standards, "[d]uties and limitations regarding future professional relationships and employment," which was at issue in *Honeycutt*, provides in consumer arbitrations (defined in standard 2(d) and (e)), if the arbitrator discloses at the outset that he or she will entertain offers of employment or new professional relationships from a

28

party or a lawyer for a party in the pending case and also states (and complies with the statement) that he or she will inform the parties of any such offer and the subsequent acceptance of the offer and the parties agree to proceed with that arbitrator, then acceptance of a new engagement, by itself, is not grounds for disqualification of the arbitrator under section 170.1 and does not constitute corruption in, or misconduct by, the arbitrator. (Ethics Standards, std. 12(d)(3)(A) & (C).) If, however, the arbitrator fails to fully inform the parties as required under the Ethics Standards, as occurred in *Honeycutt*, that failure is a sufficient ground for disqualification of the arbitrator under standard 10(a) and establishes a mandatory basis for vacating the arbitration award. (§ 1286.2, subd. (a)(6)(A); *Honeycutt*, *supra*, 25 Cal.App.5th at pp. 924-925.) In nonconsumer arbitrations, in contrast, if the arbitrator states he or she will entertain offers of employment or new professional relationships and he or she will not inform the parties of offers or acceptance of offers, no further disclosure of subsequent offers need be made. (Ethics Standards, std. 12(d).)

The provisions of standard 12 (and corresponding changes to standard 7), as amended effective July 1, 2014, distinguishing consumer and nonconsumer arbitrations and protecting neutrals who fully comply with the standard's disclosure requirements represented a middle ground among the competing views of the various stakeholders involved in the private dispute resolution industry. (See Judicial Council of Cal., Rep. and Recommendations from Civil and Small Claims Advisory Com. (Sept. 19, 2013) pp. 16-19, 25.) Privately compensated temporary judges do not share the benefits or burdens of that compromise: They do not have the option available to arbitrators in

29

nonconsumer arbitrations of simply stating they will not disclose future offers involving a party or a lawyer for a party, nor will timely disclosure of offers and acceptances of subsequent professional relationships involving the parties or lawyers before them insulate a temporary judge from disqualification based on perceived bias. Canon 6 makes such disclosures mandatory in all instances, and a temporary judge is subject to challenge under canon 6D(3) even if a new professional relationship has been disclosed in a timely manner.

Likewise, there is no provision in the Code of Civil Procedure, the Rules of Court or canon 6 that parallels Ethics Standards, standard 10(a), which provides an arbitrator's failure to comply with his or her disclosure obligations is a ground for disqualification, or section 1286.2, subdivision (a)(6)(A), which mandates the court vacate an arbitration award if the arbitrator "failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware." Rather, a temporary judge's acceptance of new professional relationships and his or her failure to make required disclosures must be judged by the might-reasonably-entertain-a-doubt standard of section 170.1, subdivision (a)(6)(A)(iii), and canon 6D(3)(a)(vii)(C). Whether disqualification is required in any particular instance in which the temporary judge fails to make mandatory disclosures, therefore, must be evaluated in light of the circumstances of that case, not on the basis of the "strict and unforgiving" provisions we enforced in *Honeycutt*.[13]

---

[13]    We perceive no justification for stricter enforcement of disclosure requirements for a private arbitrator than for a privately compensated temporary judge, who serves in a public capacity as a public official. (Compare *In re Marriage of Assemi*

30

b. *A reasonable doubt as to impartiality exists*

Although the strict rules we applied in *Honeycutt* do not provide the basis for disqualifying Judge Ouderkirk, his disqualification is nonetheless required under section 170.1(a)(6)(A)(iii) and canon 6D(3)(a)(vii)(C): Advised of Judge Ouderkirk's involvement in two previously undisclosed matters in 2019/2020 in which Pitt's counsel represented one of the parties, thereby renewing and expanding a relationship with lawyers who had in the past attained the status of significant repeat-players, in conjunction with Judge Ouderkirk's failure to voluntarily disclose those matters to Jolie and her new lawyer, who had no prior professional relationship with the judge, the person on the street might reasonably entertain a doubt as to Judge Ouderkirk's ability, consciously or subconsciously, to remain impartial in the upcoming, hotly contested custody dispute. Indeed, Pitt's counsel's advocacy—over objection—for the extension of Judge Ouderkirk's appointment in *Levitan* and his request for, and Judge Ouderkirk's acceptance of, a new

---

(1994) 7 Cal.4th 896, 908 ["[o]nce a temporary judge has taken an oath of office, he or she has the same authority as a regular judge [citation], basically is bound by the same rules of evidence and procedures as those applicable in superior court trials, and is empowered to render an appealable judgment in the same manner as a regular judge"] with *Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 916 ["'the decision to arbitrate grievances evinces the parties' intent to bypass the judicial system'"].) We urge the Judicial Council to consider adopting a rule of court similar to the provisions of Ethics Standards, standard 10(a), that mandate disqualification of a privately compensated temporary judge who has violated his or her disclosure obligations under canon 6 and rule 2.831(d).

31

appointment in *Merade* in the months leading up to an effort by Pitt to modify the parties' stipulated custody judgment, even without considering Judge Ouderkirk's failure to disclose, create a level of discomfort that might justify disqualification.[14] When coupled with Judge Ouderkirk's breach of his ethical obligation to timely disclose the new professional relationships in 2019 and 2020, the broad standard of those provisions—"might reasonably entertain a doubt"—has certainly been satisfied.[15] (See *Wechsler v. Superior Court*, *supra*, 224 Cal.App.4th at p. 390 ["A party moving for disqualification need not show actual bias because the Legislature sought to guarantee not only fairness to individual litigants, but also to ensure public confidence in the judiciary

_____

[14] Judge Ouderkirk and Pitt attempt to minimize the significance of Judge Ouderkirk's failure to timely disclose his designation as the privately compensated temporary judge in *Merade* and the extension of his appointment in *Levitan* by explaining the first matter only involved "a few hours" of Judge Ouderkirk's time and the postjudgment issue in the second was never presented to him. However, as this case demonstrates, family law matters often have a long life after the parties and the family law judge believe everything has been resolved. The designation of a privately compensated temporary judge, even if initially only intended for a limited purpose, creates the opportunity for an ongoing stream of business. Accordingly, it is the fact of the appointment or its extension that is significant for purposes of assessing whether an appearance of bias might have been created, not the number of hours logged to date.

[15] Judge Larsh, in denying Jolie's statement of disqualification, did not consider Judge Ouderkirk's breach of his obligation to make timely disclosures as a factor in evaluating whether a person aware of all the facts might reasonably entertain a doubt as to Judge Ouderkirk's ability to be impartial.

[citation], which may be irreparably harmed if a case is allowed to proceed before a judge who *appears* to be tainted [citation]. A party has the right to an objective decision maker and to a decision maker who appears to be fair and impartial," internal quotation marks omitted]; see also *People v. Freeman*, *supra*, 47 Cal.4th at pp. 1000-1001 [explaining that a statutory disqualification scheme is intended to ensure public confidence in the judiciary].)

In coming to our conclusion regarding the possibility of reasonable doubt as to Judge Ouderkirk's ability to be impartial, we do not believe it is irrelevant that Jolie is now represented by someone who is not a repeat-player in Judge Ouderkirk's court. Certainly, a change in counsel will not vitiate prior consent given after proper disclosures. But new facts suggesting a ground for disqualification must be evaluated in light of the circumstances then existing. That only one side in a case is represented by counsel who regularly uses the services of a privately compensated judge is one of the facts of which the hypothetical reasonable person would be aware in assessing whether that judge appears to be biased.

### c. *Pitt's contrary arguments fail*

None of Pitt's arguments that a reasonable person would not have cause to doubt Judge Ouderkirk's impartiality withstands scrutiny. First, Pitt contends Jolie's challenge to Judge Ouderkirk is impermissibly predicated on a "numerosity analysis" rejected by the court of appeal in *Dornbirer v. Kaiser Foundation Health Plan, Inc.* (2008) 166 Cal.App.4th 831 (*Dornbirer*). When the parties engaged Judge Ouderkirk in January 2017, Pitt explains, Jolie and her counsel knew, based on disclosures at that time, that Spiegel had in the past retained Judge Ouderkirk once or twice a year and that one additional matter was anticipated. Several

more matters over which Judge Ouderkirk presided and in which Pitt's counsel appeared as counsel of record were subsequently disclosed in 2018.  Against this background, Pitt argues an increase by two in the number of cases involving his counsel in which Judge Ouderkirk served as a temporary judge, as revealed in July 2020, is "both unsurprising and immaterial."

Pitt's argument is doubly flawed.  First, *Dornbirer* (a case involving a private arbitrator, not a temporary judge) addressed waiver, not whether a subsequent disclosure of new professional relationships between the neutral and a party was material. Dornbirer argued the arbitrator's initial disclosure did not clearly reflect how many times he had served in matters in which Kaiser, the opposing party, had been involved.  (*Dornbirer*, *supra*, 166 Cal.App.4th at p. 836.)  The court of appeal affirmed the superior court's denial of Dornbirer's petition to vacate the arbitration award in favor of Kaiser, pointing out that the arbitrator's initial disclosure letter arguably identified all the prior matters involving Kaiser (*id.* at p. 841),[16] and explaining, even if the letter "may be ambiguous with regard to the precise number of cases he had previously arbitrated in which Kaiser was a party, the disclosure was sufficient to put Dornbirer on notice that Adelman had served as an arbitrator in a large

---

[16]     The letter disclosed 15 prior arbitrations involving the law firm that was representing Kaiser in Dornbirer's case and "eleven other matters involving Kaiser."  (*Dornbirer*, *supra*, 166 Cal.App.4th at p. 840.)  Dornbirer argued the separation into two categories implied the 15 matters involving the law firm did not involve Kaiser.  The court of appeal stated the letter "can just as easily be read as disclosing that all 26 arbitrations involved Kaiser," emphasizing the arbitrator's use of the word "other."  (*Id.* at p. 841.)

number of such cases." (*Ibid*.) For purposes of deciding whether to object to the arbitrator at the outset of the proceeding, the court held, the difference between 11 prior matters and 26 "would not be sufficiently material to the issue of the arbitrator's impartiality to render the disclosure fatally defective under the statute." (*Ibid*.) Dornbirer's remedy was to seek to disqualify the arbitrator for an appearance of bias based on the information she had before the arbitration commenced, not after the arbitration was over. (See *Honeycutt*, *supra*, 25 Cal.App.5th at p. 926 [citing *Dornbirer* for the principle a claimant waives the right to disqualify the arbitrator for inadequate initial disclosures by consenting to proceed with the arbitration].)

Second, it may be immaterial for purposes of a party's decision whether to stipulate to a particular temporary judge that the initial disclosure report states he or she was retained in 10 prior cases in which one of the parties' counsel was involved when, in fact, there were 12. But the cumulative effect of potentially disqualifying events sometimes will matter. That is the very purpose for requiring continuing disclosures. (Cf. § 170.4, subd. (c)(3) [authorizing a second statement of disqualification against a judge when based on facts suggesting new grounds for disqualification first learned of, or that arose after, the first statement was filed].)[17] Here, Jolie's challenge to Judge Ouderkirk was not predicated on an inaccurate description of his history of working together with Pitt's counsel, but on just-

---

[17] As discussed, unlike the arbitrator in a consumer arbitration who is not subject to disqualification based solely on the acceptance of new professional relationships with a party or lawyer for a party, provided the arbitrator has made all required disclosures, a temporary judge enjoys no such immunity.

acquired information that he continued to be compensated in newly disclosed cases involving Pitt's counsel while the Jolie/Pitt matter was pending. That is not simply the difference between 10 or 12, as Pitt would have it, but between a history of past relationships and an inventory of current ones.

As for Judge Ouderkirk's failure to disclose the *Merade* and *Hankey* matters as required by canon 6 and rule 2.831(d), Pitt attempts to dismiss its significance in assessing the appearance of bias by arguing Spiegel and Wasser were aware that Judge Ouderkirk did not promptly disclose his retention in matters in which they were involved. Pitt points out that Judge Ouderkirk first disclosed the *Goldman* case, in which one of Wasser's partners represented a party, in May 2018 although it began in January 2018. And the 2016 "D-13" matter in which both Spiegel and Wasser were counsel was omitted from the January 2017 disclosures and not identified until May 2018 when the association of new counsel triggered the supplemental disclosure report.

We decline to embrace such a cavalier approach to a temporary judge's violations of canon 6. That lawyers familiar with a particular judge may tolerate his or her ethical lapses—for example, a regular practice of engaging in prohibited ex parte communications—should not prevent a new lawyer who has substituted into the case from objecting when a new violation occurs. Judge Ouderkirk's continuing ethical obligation to make required disclosures of professional relationships with the parties or lawyers appearing before him under canon 6D(5)(a) is no less significant than his obligation to avoid ex parte communications as specified in canons 3B(7) and 6D(2)(a); and Jolie's new counsel,

36

having learned of a new violation, was entitled to advance that as part of the grounds for Judge Ouderkirk's disqualification.

We emphasize the issue here is not whether DeJean could seek to disqualify Judge Ouderkirk on Jolie's behalf based on delayed disclosures that had occurred while Wasser was representing Jolie. Nor is it even whether Wasser, having failed to complain about belated disclosures in the past, would somehow be estopped from deciding "enough," and asserting yet another, new breach of canon 6 as a ground for disqualification if she were still representing Jolie. Instead, the sole question we confront is whether, because Spiegel and Wasser apparently accepted Judge Ouderkirk's indifference to his obligation to make timely disclosures of professional relationships with the parties and their lawyers who appear before him, Judge Ouderkirk enjoys carte blanche to continue to violate his ethical responsibilities. He does not.

Moreover, the ethical violation Jolie contends creates doubt as to Judge Ouderkirk's impartiality is his failure to voluntarily disclose the new matters at all, not simply a delay in disclosure, as occurred in the instances Pitt cites. Nothing in the record suggests Jolie's prior counsel or Jolie herself previously approved of similar nondisclosures.

In sum, Judge Ouderkirk's ethical breach, considered together with the information disclosed concerning his recent professional relationships with Pitt's counsel, might cause an objective person, aware of all the facts, reasonably to entertain a doubt as to the judge's ability to be impartial. Disqualification is required.

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its November 16, 2020 order denying Jolie's statement of disqualification and to make a new order disqualifying Judge Ouderkirk. The parties are to bear their own costs in this proceeding.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.

SEGAL, J., Concurring.

I agree entirely with the opinion of the court.  I write separately to express my concern that the following three propositions are currently the law in California:  (1) Temporary judges are judges; (2) Judges cannot be privately compensated; (3) Temporary judges can be privately compensated.  One of these statements must be wrong.  I believe it is (3).

Unlike arbitrators and referees, "[t]emporary judges have broad powers substantially comparable to those of . . . sitting judges."  (*Hayward v. Superior Court* (2016) 2 Cal.App.5th 10, 46.)  "'[W]hen acting,'" a temporary judge "'is acting for the superior court,'" and a temporary judge's "'judgments and orders . . . are entitled to the same presumption of regularity as a court with a regular judge presiding.'"  (*Estate of Kent* (1936) 6 Cal.2d 154, 163; see *In re Marriage of Assemi* (1994) 7 Cal.4th 896, 908 ["Once a temporary judge has taken an oath of office, he or she has the same authority as a regular judge [citation], basically is bound by the same rules of evidence and procedures as those applicable in superior court trials, and is empowered to render an appealable judgment in the same manner as a regular judge."]; *Kajima Engineering and Construction, Inc. v. Pacific Bell* (2002) 103 Cal.App.4th 1397, 1401 ["In contrast to the circumscribed authority of a referee, a temporary judge has broad powers," including "'the power to render a judgment which is appealable in the same manner as one rendered by a constitutional judge.'"]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2020) ¶ 6:58 [a "temporary judge has all the powers of a sitting judge in the proceeding before the court"].)  Temporary judges, during the term of their appointment, are superior court judges, just like regular, sitting judges.

Parties appearing before a regular, sitting judge cannot pay the judge for adjudicating their case. This is true even if the parties agree to compensate the judge, and even if they agree each side will pay the judge an equal amount. (See *In re Campbell* (D.C. 1987) 522 A.2d 892, 897 ["for judges to accept money from litigants in their courts, even though they in fact do nothing to favor those litigants, strikes at the core of the impartiality demanded of judges"], adopting the recommendation of a board of professional responsibility.) For example, parties to a case in superior court before a regular, sitting judge cannot privately compensate the judge to obtain benefits or advantages for their case—such as calendar preference, priority in obtaining hearing dates for motions, permission to file documents under seal that otherwise would not qualify for sealing under California Rules of Court, rule 2.550(d),[1] or additional days for trial— regardless of the parties' willingness to contribute equally to the judge's additional compensation. No one would think of doing such a thing. Indeed, it is a misdemeanor for any judge to ask for or receive "any emolument, gratuity, or reward, or any promise thereof, except such as may be authorized by law, for doing any official act." (Pen. Code, § 94.) Yet the California Rules of Court currently allow temporary judges to receive compensation from parties who appear before them, even though temporary judges are, well, judges.

---

[1] Under California Rules of Court, rule 2.835(a), a motion or application to seal records must be filed with the court and "heard by the trial court judge to whom the case is assigned or, if the case has not been assigned, by the presiding judge or his or her designee," not by the temporary judge.

It wasn't always this way.  As the court explains (see maj. opn. *ante*, at p. 11, fn. 5), when the Judicial Council proposed rules that recognized such a thing as a "privately compensated temporary judge," several sitting judges responded with comments.  Judge Robert H. O'Brien of the Los Angeles County Superior Court wrote that "joint operation" of the court "with private enterprise is an improper commingling of the [judicial] branch of government with private judging associations or individual private judges."  On the issue of temporary judges, Judge O'Brien pointed out that article VI, section 21 of the California Constitution is not "a constitutional recognition of a public/private judging system."[2]  (Judicial Council of Cal., Admin. Off. of Cts., Rep. on Rules to Implement Recommendations of the Ad Hoc Committee on Private Judges (1992) (1992 Judicial Council Report), pp. 4, 29, 32, letter from Judge Robert H. O'Brien, July 17, 1992.)

Judge James T. Ford of the Sacramento County Superior Court wrote that privately compensating temporary judging was probably criminal.  "Penal Code section 94 bars judicial officers from accepting gratuities for performing public acts.  Judges pro tempore [i.e., temporary judges] have identical powers as sitting judges, and their decisions are those of the court without any further intervention by sitting judges.  Accordingly, they must be deemed judicial officers within the meaning of the section."  Judge Ford also wrote that privately compensating temporary judges was unethical under the California Code of Judicial Ethics.  Citing former canon 5C(1), now canon 4D(1)(b), which

---

[2]     Indeed, as the court points out (see maj. opn. *ante*, at p. 11, fn. 5), the California Constitution does not authorize privately compensated temporary judges.

currently states a judge "shall not engage in financial and business dealings" that "involve the judge in frequent transactions or continuing business relationships with lawyers or other persons likely to appear before the court on which the judge serves,"[3] Judge Ford wrote: "While clearly not adopted with this recent phenomenon in mind, the Code stands for an important principle: justice and money do not mix. Judging is not in any way a private function; it is a quintessential public function, and should be administered without regard to compensation of the judge." Judge Ford concluded by asking the Judicial Council not to authorize privately compensated temporary judges: "I urge the judiciary to recognize that privately compensating judges pro tempore is illegal and pernicious. We are not for sale, nor is the product of our labor." (1992 Judicial Council Report, pp. 4, 25, 27, letter from Judge James T. Ford, Aug. 20, 1992.)

As the court further explains (see maj. opn. *ante*, at p. 11, fn. 5), the ad hoc committee appointed to review comments like those of Judge O'Brien and Judge Ford, and to suggest revisions to the proposed rules, had a solution to the problem. The committee proposed allowing temporary judges to be "paid by the court" or to work "pro bono," but prohibiting them from receiving private compensation except when "serving as referees"—i.e., except when serving without the power and authority of a regular, sitting judge. (Judicial Council of Cal., Admin. Off. of Cts., Rep. on Rules to Implement Recommendations of the Ad Hoc Committee on Private Judges (1993), p. 7.)

---

[3] The Advisory Committee Commentary to canon 4D(1) makes clear that this prohibition applies to "persons likely to appear either before the judge personally or before other judges on the judge's court."

4

Another solution, however, was found.  As the court explains, the Legislature added the following sentence to Penal Code section 94:  "The lawful compensation of a temporary judge shall be prescribed by Judicial Council rule."  That this amendment was designed to respond to the concern raised by Judge Ford is clear from its legislative history:  "Compensation for temporary judges.  Penal Code Section 94 (PC 94) can be read to prohibit judicial officers, including temporary judges, from collecting a fee for their official services without specific statutory authorization.  A judicial officer who violates this prohibition is guilty of a misdemeanor.  [¶]  As a practical matter, however, parties involved in a dispute may choose to have a temporary judge (e.g., a retired judge) assist them in resolving their dispute.  These temporary judges will agree to provide the requested service for a fee to be paid by the parties.  Because there is no statutory authorization for temporary judges to collect these fees, these arrangements may be in violation of PC 94.  [¶]  This bill provides that it will be lawful [for] temporary judges to be compensated according to prescribed Judicial Council rule." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 15 (1993-1994 Reg. Sess.) Aug. 25, 1993, p. 2.)

The Judicial Council subsequently enacted a rule of court that ultimately became California Rule of Court, rule 2.832.  The current version of the rule does not take a position on the propriety of privately compensating a temporary judge or even require the parties to contribute equally to the temporary judge's compensation.  The rule provides only that a temporary judge may not be privately compensated by the parties unless they agree in writing on the rate of compensation.

But just because it is no longer criminal for a temporary judge to receive compensation from private parties doesn't mean it's a good idea.  The Legislature directed the Judicial Council to prescribe rules governing compensation of temporary judges.[4]  I believe the Judicial Council should adopt the rule its ad hoc committee recommended in 1993:  Temporary judges may be paid by the court, but may not be privately compensated except when serving as court-appointed referees.  The Judicial Council created the term "privately compensated temporary judge," or at least approved the concept.  In my view, it is time for the Judicial Council to reconsider that decision.[5]

SEGAL, J.

---

[4]  Judge O'Brien, in his comments to the original proposed rule, had his doubts about whether the Judicial Council was the right entity to prescribe rules for compensating temporary judges.  He thought "the promulgation of rules implementing" private judging "should not include judges.  Judges have a conflict of interest in considering how the judiciary should approach private judging . . . .  [V]irtually all sitting judges are in favor of private judging . . . because they see that it will personally benefit them when they retire. . . .  Policy decisions on this issue should be made either by the Supreme Court or the Legislature."  (1992 Judicial Council Report, pp. 30-31, letter from Judge Robert H. O'Brien, July 17, 1992.)

[5]  Of course, my view does not apply to decisionmakers like arbitrators, referees, special masters, and court-appointed receivers.  They are not, and do not purport to be, judges.  Temporary judges are judges.  And that makes all the difference.